## SPONENBARGER v. UNITED STATES.
### No. 7984.

District Court, E. D. Arkansas, W. D. Oct. 20, 1937.

As Modified Dec. 23, 1937.

Lamar Williamson, of Monticello, Ark., and E. E. Hopson, of McGehee, Ark., for plaintiff Julia Caroline Sponenbarger.

Fred A. Isgrig, U. S. Atty., of Little Rock, Ark., and John C. Dyott, Sp. Asst. to Atty. Gen., for the United States.

Henry Davis, of St. Louis, Mo. (of Bryan, Williams, Cave & McPheeters, of St. Louis, Mo.), for St. Louis Union Trust Co.

Hendrix Rowell, of Pine Bluff, Ark., and De Witt Poe, of McGehee, Ark., for Cypress Creek Drainage Dist., and Alex H. Rowell and William R. Humphrey, receivers.

J. W. House, of Little Rock, Ark., for Grady Miller, receiver of Southeast Arkansas Levee Dist.

Fred Armstrong, of St. Louis, Mo. (of Thompson, Mitchell, Thompson & Young, of St. Louis, Mo.), for Mercantile-Commerce Bank & Trust Co. and Mercantile Commerce Nat. Bank.

DAVIS, District Judge.

This action was instituted under the Tucker Act, 28 U.S.C.A. § 41 (20), for compensation for the alleged taking of plaintiff's property for a public purpose. Plaintiff owns forty acres of land in Desha county, Ark., the fair market value of which, it is alleged, was reduced from $5,000 to $1,000 as a result of the establishment of the Boeuf floodway, which included plaintiff's property, under authority of the Flood Control Act of May 15, 1928, 33 U.S.C.A. §§ 702a, 702b–702d, 702e–702g, 702h–702j, 702k, 702l, 702m.

The additional parties plaintiff were made parties upon motion of defendant.

The answer of defendant asserted (1) that the enactment of the Flood Control Act created no express or implied obligation to compensate plaintiff, and that no act of the government done under authority of the said statute constituted a taking of plaintiff's property; and (2) that the Boeuf floodway had by a subsequent act of Congress (June 15, 1936, 33 U.S.C.A. §§ 702a-1 to 702a-10) been abandoned and the Eudora floodway substituted in lieu thereof.

Following a destructive flood in 1927, Congress authorized the execution of an

extensive flood control program in the Mississippi Valley, from Cape Girardeau, Mo., to the Head of the Passes in Louisiana. The Flood Control Act adopted a plan suggested by the Chief of Engineers, commonly called the "Jadwin plan," as the same was set out in Document No. 90, House of Representatives, 70th Congress, 1st Session. That portion of the plan of immediate concern in this case deals with the suggested treatment of the Mississippi river from the White and Arkansas rivers, on the north, to the Red river, on the south, usually referred to as the "middle section."[1]

During periods of unusually high water in the Mississippi river, the stress on the levee system was increased at the mouth of the Arkansas and the White river. The levees in that vicinity did not withstand the flood waters of 1927, but crevassed at Medford, and Pendleton on the south side of the Arkansas, and at Mounds Landing on the east side of the Mississippi. To protect against floods approximating or equaling that of 1927, it was conceived to be necessary to relieve the riverside levees by diverting a substantial portion of the water from the channel of the river into a designed floodway.

The Jadwin plan made provision for a floodway starting shortly south of the mouth of the Arkansas river, at Cypress creek, thence southwardly along the basin of the Boeuf river to the backwater area of the Red river in the State of Louisiana. The source of this floodway, as planned, extended along the levee on the west side of the Mississippi river from Rohwer to Luna Landing, a distance of 30 miles.

The essential features of the proposed floodway, as they were set forth in the

---

[1] House Document No. 90:

"117. Old River to the Arkansas.—The flood of 1927 rose 60.5 on the Arkansas City gauge. It has been estimated that had it been confined and crevasses not occurred the gauge height would have been 69. The top of the present levee is 60.5. To take care of this flood with proper freeboard would require present levees to be raised about 12 feet. Such an increase in levee height would greatly intensify the disaster resulting from an accidental failure of a levee, besides being inordinately costly. Nor would they be safe, for it has been estimated that floods might come which would produce, if confined, stages of over 74 feet. It is obvious that no attempt should be made to raise levees to such a height. The practical remedy is to raise the levee grade 3 feet on both sides of the Mississippi below the Arkansas River, to strengthen these levees so that they will not fail from causes other than accident or overtopping, and to preclude overtopping by insuring that the water in excess of the capacity of the leveed channel be spilled out near the mouth of the Arkansas.

"118. To insure that excess water will leave the main river, a fuse plug section of the levee in the vicinity of Cypress Creek must be kept at its present strength and at its present grade, viz, 3 feet below the new levee grade. This relatively weak section will be long enough to discharge the greatest predicted possible excess water over and above the capacity of the leveed river below. In order to limit the land in the Tensas Basin overflowed by it, levees will be constructed on each side of the Boeuf River bottom, where natural ridges do not serve, from the Cypress Creek levee to backwater in the lower Tensas Basin. Arkansas City is to be inclosed with a levee. This floodway will be wide enough to carry the water without clearing and without maintenance except for the side levees. It is unwise to attempt to limit the volume of flow that may possibly enter the floodway to a narrower floodway that might prove of insufficient capacity. A narrower floodway cleared of timber was considered, but the clearing was found to be unwarrantably expensive in first cost and maintenance for the increased efficiency of discharge produced thereby. It will be much better to let the land be gradually cleared as it is developed for use. At some future time, the development of the region may warrant the first cost and maintenance of a cleared floodway of less width.

"119. The Boeuf River bottom is selected for this diversion because it is the most suitably located to receive the water, is the most direct route, has the best width, and covers largely undeveloped swamp land. Water will not top the Cypress Creek fuse plug levee and go down the floodway until it is so high that it must find an outlet. No flood except that of 1927 has reached such a stage. However, due to an increase in flood heights by reason of levee construction and drainage, it has been estimated that a stage over the present levee top at Cypress Creek might occur in the long run about once in 12 years. The lands in the floodway will be inundated only by floods that would overtop the present levee system, and they will retain the same measure of protection that they now have."

plan adopted, were: (1) A section of the riverside levee at Cypress creek, designated a fuse plug, across the upper end of the floodway, of less height than the contiguous levee, or the levee on the opposite side of the river; this was to be provided by leaving intact and unaltered the then existing riverside levee, built and maintained at the 1914 grade and section, as established by the Mississippi River Commission. The grade of this fuse plug section was equivalent to 60.5 feet on the gauge at Arkansas City. When the river reached that stage, the water would run over the levee and into the floodway. (2) The grade of the riverside levees above and below the fuse plug section, as well as that on the east side of the river, was to be raised 3 feet, to effect the entry of excess flood water into the floodway. (3) A system of guide levees on the east and the west side of the floodway to hold the water in the designated channel, and prevent it from spreading out on the lands on either side.

The Floodway Act created a board to adjust engineering differences between the adopted project and the plans suggested by the Mississippi River Commission, and to make recommendations to the President. The decision of the President on such matters was to be final. This decision was made on January 10, 1929, in a communication to the Secretary of War, in which he approved the construction of the levees in the Boeuf floodway.[2]

The execution of the flood control program was commenced in 1929, and has been continued to the present time. When this suit was filed in August, 1934, the status of the contemplated work in the middle section was this: The levee, for a distance of about 60 miles, from Yancopin, on the south bank of the Arkansas river, to Vancluse, on the west bank of the Mississippi, remained at the 1914 grade and section. This not only included the fuse plug section, but also about 15 miles of the original levee, both above and below the fuse plug section. The riverside levee, above and below the 60-mile Cypress Creek gap, had been raised about 3 feet to the 1928 grade and section, and the levee on the east bank of the Mississippi had likewise been raised to the new grade.

The reason that the long gap of the old levee was left intact, instead of merely the fuse plug section, is to be found in a provision of the Flood Control Act, to the effect that, pending completion of the floodway, lands within it are to have the same protection as lands on either side.[3]

The government did not proceed with the construction of the Boeuf floodway on account of "local opposition."[4] In fact, its progress was enjoined.[5] The Committee on Flood Control of the House of Representatives, on January 28, 1932, requested the Chief of Engineers to review the status of the works then in progress with

[2] The President approved in the following language:

"Washington, January 10, 1929.

"Supplementing my approval of August 13, 1928, of the report of the board provided for in section 1 of 'An Act for the control of floods on the Mississippi River and its tributaries, and for other purposes,' approved May 15, 1928 [33 U. S.C.A. § 702a], which approval excepted and reserved for future action those parts of the report which contemplated the acquiring of rights in land for constructing spillways and floodways, the construction of the protection levees in the Boeuf Basin, as provided for in the adopted project, is approved.

"Land for rights-of-way for these levees will be secured by condemnation as authorized by law, provided that those lands may be purchased, when they can be thus secured at reasonable prices, which shall not in any case exceed two and one-half times the assessed valuation of the present time.

"[Signed] Calvin Coolidge."

(House Committee Document No. 2, 71st Congress, 1st Session, page 12.)

[3] Section 702a—"Provided further, that pending completion of any floodway, spillway, or diversion channel, the areas within the same shall be given the same degree of protection as is afforded by levees on the west side of the river contiguous to the levee at the head of said floodway."

[4] Report of Chief of Engineers, February 12, 1935, Flood Committee, Document No. 1, House of Representatives, 74th Congress, 1st Session:

"9. All parts of the project works in the middle section, except the Boeuf Floodway and the raising of the main river levees adjacent to its head, have in general been completed. Because of local opposition the construction of the Boeuf Floodway levees has not been undertaken. * * *"

[5] United States v. Kincaid (C.C.A.5) 49 F.(2d) 768; reversed, Hurley, Secretary of War, v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637.

the view of determining whether modifications should be made in the plan. The response was the report of the Chief of Engineers, dated February 12, 1935.

This report contained a complete review of the progress of the flood control program, and recommended the amendment of the Act of May 15, 1928, in certain instances, one of which affected the plan as applied to the "middle section" of the river. This recommendation was that the Boeuf floodway as provided in the Jadwin plan be abandoned, and the Eudora floodway be substituted in lieu thereof; the suggested new floodway to have its source on the west side of the Mississippi river, near the town of Eudora, Ark., about 100 miles south of the mouth of the Arkansas river. A back protection levee was to extend from the head of this floodway to the Arkansas river. The pertinent section of the report of the Chief of Engineers is printed in the footnote.[6]

Congress adopted the recommendations of the Chief of Engineers by the passage of the Overton Bill, approved June 15, 1936, 49 Stat. 1508, 33 U.S.C.A. 702a-1 to 702a-10.[7] The plan of flood control thus provided for the section of the valley from the Arkansas river to the Red river is commonly referred to as the Markham plan.

A detailed description of the Eudora floodway or its operation is not conceived to be necessary in this case. Its general course is much the same as the Boeuf Basin, but it clings closer to the west bank of the Mississippi, passing on the east side of Macon ridge, and terminates in the backwater area of the Red river.

The total acreage of the Boeuf floodway is approximately 1,326,000 acres. In the Eudora floodway, there are 702,000 acres. The northern extension of this floodway to the Arkansas river would add 119,000 acres, making a total acreage of 821,000.

The plaintiff's land is also in the Eudora floodway, but reliance is not placed upon that fact in this case.

---

[6] Report of Chief of Engineers, February 12, 1935, Flood Committee Document No. 1, House of Representatives, 74th Congress, 1st Session:

"43. I recommend that the project for the flood control of the Mississippi River in its alluvial valley and for its improvement from the Head of the Passes to Cape Girardeau, authorized by the Flood Control Act of May 15, 1928, be amended substantially as recommended by the Mississippi River Commission in its report dated January 19, 1935, to provide:

"(1) The abandonment of the Boeuf Floodway, and in lieu thereof the construction of the Eudora Floodway, west of the Mississippi River extending from the latitude of Eudora into the Red River backwater area, with a control structure at its head.

"(2) A back-protection levee extending from the head of this floodway north to the Arkansas River, so located as to afford adequate space for the escape of flood waters without endangering the levees on the east side of the river.

"(3) The maintenance of the present river levees between the head of the Eudora Floodway and the northern junction with the protection levee, at the 1914 grade and section, except in front of densely populated areas, as a part of a ring levee."

[7] Act of June 15, 1936, 49 Stat. 1508, 1509, §§ 1 and 2 (33 U.S.C.A. §§ 702a-1, 702a-2:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the project for the control of floods of the Mississippi River and its tributaries, adopted by Public Act Numbered 391, approved May 15, 1928 (45 Stat. 534), Seventieth Congress, entitled 'An Act for the control of floods on the Mississippi River and its tributaries, and for other purposes,' is hereby modified in accordance with the recommendations of section 43 of the report submitted by the Chief of Engineers to the Chairman of the Committee on Flood Control, dated February 12, 1935, and printed in House Committee on Flood Control Document Numbered 1, Seventy-fourth Congress, first session, as hereinafter further modified and amended; and as so modified is hereby adopted and authorized and directed to be prosecuted under the direction of the Secretary of War and the supervision of the Chief of Engineers.

"Sec. 2. That the Boeuf Floodway, authorized by the provisions adopted in the Flood Control Act of May 15, 1928, shall be abandoned as soon as the Eudora Floodway, provided for in Flood Control Committee Document Numbered 1, Seventy-fourth Congress, first session, is in operative condition and the back-protection levee recommended in said document, extending north from the head of the Eudora Floodway, shall have been constructed."

The Mississippi river between the Arkansas and the Red rivers follows a very winding course. There are levees on either side, but, in the main, these levees are many miles apart. Between those levees, the river winds back and forth from east to west, and west to east, forming loops, known as the Greenville bends, while the general course of the stream is to the south. During the progress of the execution of the flood control program, the government has undertaken to straighten the channel and increase its discharge capacity, by making a series of "cut offs," thus eliminating some of the bends. Eleven of these cut-offs have now been made, and a system of dredging installed to protect and improve the channel of the river. The engineers refer to this program as channel stabilization. The distance by river from the Arkansas to the Red rivers was 372.3 miles, and by reason of the cut-offs it has been shortened 100.6 miles.[8]

One purpose of this program is to increase the discharge capacity of the river. The engineering witnesses at the trial were in accord on the fact that as a result of this program the flood level of the river in the vicinity of the Cypress creek gap was lowered during the flood of February, 1937. But there was disagreement among the engineers as to whether this effect was temporary or permanent, and as to whether this practice was sufficiently free from hazard as to be advisable.

It was also contended by the plaintiff that the making of the cut-offs was not in accord with the Jadwin plan, and hence of no concern in this case.[9]

The defendant, on the other hand, contended that channel stabilization, which includes the making of cut-offs, was an integral part of the flood control plan.[10]

■ It must be clear that the original flood control plan did not essentially have

---

[8] Report of Chief of Engineers, Committee on Flood Control, Document No. 1:

"10. The course of the Mississippi River in the middle section is generally tortuous, especially through the Greenville Bends, a series of wide loops below the mouth of the Arkansas. With a view to increasing its flood discharge capacity, experimental work on a large scale has been undertaken in the rectification of the channel by cut-offs. This rectification through the Greenville Bends, by the forces of nature or by design, may so lower the local flood heights that the fuse-plug levees at the head of the Boeuf Floodway will carry more than the safe capacity of the river below them."

[9] House Document No. 90:

"69. Straightening channel.—Artificial or natural cut-offs shorten the reach where they occur and by increasing the slope and velocity produce a local lowering of the flood stage. However, the increased velocities immediately cause excessive bank caving either in the reach or near it, and the river eventually lengthens itself with new bends. The changes in the channel cause great damage and expense. The bank revetment now in use, expensive as it is, has not been subjected to and withstood such velocities as would be caused by cut-offs. Low-water navigation in any stretch is likely to be temporarily destroyed by bars created by the excessive bank caving caused by a cut-off. The method is too uncertain and threatening to warrant adoption.

"70. In an unsettled region and on an unleveed alluvial stream a program of

cut-offs and bank protection, begun at the lower end of the river and progressing upstream, might be desirable in anticipation of settlement of the region. But such a condition is not hypothetical. In the present case, the river banks are not yet revetted to the extent necessary for shortening of the stream, nor will they be for years; levees are already in place, though not to final height, conforming to the river in its present shape; valuable cultivated land would be lost, and landings and towns along the river would be cut off from navigation. Completion of the levees needed for protection can not be postponed until a cut-off and revetment project could be carried out.

"71. It is advisable to adhere to the present policy of preserving the river generally in its present form and not to undertake a plan of flood control or of improvement for navigation that involves the formation of cut-offs."

[10] House Document No. 90:

"147. I recommend the adoption and authorization of a comprehensive project for the flood control of the Mississippi River in its alluvial valley and its improvement from the Head of the Passes to the Ohio River as set forth in this document, to be prosecuted under the direction of the Secretary of War and the supervision of the Chief of Engineers; the project to include the floodways, spillways, levees, channel stabilization, mapping, etc., hereinbefore recommended, with such modifications thereof as in the discretion of the Secretary of War and Chief of Engineers may be advisable, and the maintenance of a navigation channel

as its basis a program of channel straightening by means of cut-offs. The hazard of this practice was clearly set out in the engineering report of the plan. On the other hand, this project, and the statute directing its execution arose out of the impetus of the most disastrous flood that ever visited the valley. A ten-year program was undertaken. The plan adopted was only in outline. Discretion as to the details of execution was vested in the Secretary of War.[11] If experience in the carrying out of the project dictated that a system of cut off be adopted, with the view of improving the channel of the river, and increasing its discharge capacity, nothing can be more certain that authority so to do may be found in the Jadwin Plan.

In the flood of January and February, 1937, when the Mississippi river reached its highest recorded stage at Cairo and Memphis, the gauge at Arkansas City was 53.87 feet. This was 6.63 feet below the point at which the fuse plug would have been overtopped. This was in·part due to the channel stabilization program carried on by the government, which reduced the flood level in the fuse plug section, and lessened the hazard to which plaintiff's property was subject.

The nature of the flood control plan and the progress that has been made in its execution have been set out in some detail, because it is conceived that this case must turn upon the factual situation.

The Tucker Act vests this court with jurisdiction to entertain certain claims against the United States "upon contract, express or implied." If an obligation to pay exists in this case, it is upon an implied contract. If·the acts and conduct of the government and its agencies have deprived the plaintiff of her property, then reason and justice dictate that an agreement to compensate be implied.

The United States has consented to be sued, but this authority is not to be broadly construed. The courts have announced a well-defined doctrine as to the character of acts affecting private property that will create an implied contract on the part of the government to compensate the owner, and upon which the owner may have a recovery in a suit at law, under the Tucker Act. That doctrine may be ascertained from a consideration of the decisions. The cases are summarized merely for the purpose of finding out the character of act on the part of the government that gives rise to an implied agreement to compensate the owner of the property affected.

In each of the following cases it was held that the facts alleged or proved showed that there was a taking of property: Where construction of a dam at Great Falls in the Potomac by the government caused water to back up on plaintiff's island, and also deprived plaintiff of valuable water rights;[12] where·a dam was so constructed

from Cairo to New Orleans not less than 300 feet in width and 9 feet in depth.
*  *  *"

"131. Channel stabilization.—Since the levees within the limits of this project are to be greatly enlarged, they will be much more expensive than heretofore, so something must be done to avoid the frequent moving of them from the proximity of caving banks. In addition, the river can not be regulated for low-water navigation until the banks are made stable, this both to keep the channel in one place and to stop the enormous dumping of earth into the river by bank caving. A general bank-protection scheme must be carried out. This will consist of revetting banks by proven methods and in addition trying new and cheaper methods to accomplish the same result. At the same time regulation of kind which has been successfully accomplished above Cairo will be undertaken below when and where the banks become stable. The plan includes a 10-year program of channel stabilization and river regulation at a total cost of $110,000,000, or $11,000,000 per year. This program may need revision upward after some years, as the rate and total amount of work above contemplated is a minimum."

[11] House Document No. 90:
"138. Program of work.—The project is to be completed within ten years. Twenty-five million dollars can be advantageously expended the first· year and approximately thirty million dollars each year thereafter ·until the project is completed.

"139. Execution of plan.—The plan herein recommended is general in its scope. It is recommended that the responsibility for the execution of the plan, the details of the design, and location of· the engineering works and structures be placed upon the Chief of Engineers under the supervision of the Secretary of· War, as is done by acts of Congress in the case of river and harbor improvements."

[12] United States v. Great Falls Mfg. Co., 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846; Great Falls Mfg. Co. v. Attorney

as to interfere with the natural flow of the water in a stream, causing the water level to be raised and the plaintiff's land to be continuously overflowed, rendering it unfit for agricultural purposes;[13] where the government constructed a dam and lock which raised the water level in the Cumberland river above its natural stage to the extent that lands not theretofore subject to overflow were frequently covered with water;[14] where a dam was built across the Fox river, raising the water level so that plaintiff's land was continuously overflowed by back water;[15] where erection of a dam caused water to back up and cover a part of plaintiff's land, preventing egress and ingress;[16] where plaintiff's farm was subjected to increased overflow by backwater from a dam erected 8 miles below;[17] where a dam, erected to improve navigation on the Muskingum, caused a permanent overflow of claimant's land;[18] where erection of a lock and dam caused water to completely cover a highway built and maintained by Wayne county, Ky.;[19] where plaintiff's mining claim in Alaska was permanently occupied by the United States Army as a camp;[20] where the government built a naval training station on land over which plaintiff had an easement, forever depriving him of its use;[21] where a fort was established on a tract adjacent to plaintiff's land on which he operated a summer resort, and guns were repeatedly fired by the government, sending projectiles over plaintiff's property.[22]

It will be observed that in each of these cases there was an actual invasion of private property, or an immediate interference with the use and enjoyment of the same.

The doctrine of these and other decisions on the subject is that where the government, in the exercise of its functions, for the promotion of some public undertaking, actually invades private property, or places some burden, not merely of a temporary character, upon the possession, use, and control of said property, there is a taking, and a promise to compensate the owner will be imputed to the United States.

The United States Supreme Court, in a recent case,[23] stated the law as follows: "in order to create an enforceable liability against the government, it is at least necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property."

Action on the part of the government, not directly encroaching upon private property, but which imposes a temporary, occasional, or incidental injury, and impairs its use is regarded as a consequential damage, and does not amount to a taking.[24]

It is not contemplated or prospective encroachments that give rise to the obligation to compensate. It is acts perform-

General, 124 U.S. 581, 8 S.Ct. 631, 31 L.Ed. 527.

[13] United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; United States v. Williams, 188 U.S. 485, 23 S. Ct. 363, 47 L.Ed. 554.

[14] United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746.

[15] Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L.Ed. 557.

[16] United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R. A.(N.S.) 385, 19 Ann.Cas. 680; United States v. Sewell, 217 U.S. 601, 30 S.Ct. 691, 54 L.Ed. 897; United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.(N.S.) 1135.

[17] Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L. R. 1.

[18] Merriam v. United States, 29 Ct.Cl. 250.

[19] Wayne County, Kentucky v. United States, 53 Ct.Cl. 417.

[20] United States v. North American

Company, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935.

[21] Tucker v. United States (D.C.) 283 F. 428.

[22] Portsmouth Harbor Land & Hotel Company v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287.

[23] Sanguinetti v. United States, 264 U. S. 146, loc. cit. 149, 44 S.Ct. 264, 265, 68 L.Ed. 608.

[24] Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Bothwell v. United States, 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238; Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351; Portsmouth Harbor Land & Hotel Co. v. United States, 250 U.S. 1, 39 S.Ct. 399, 63 L.Ed. 809; Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274; Salliotte v. King Bridge Co. (C.C.A.) 122 F. 378, 65 L.R.A. 620; Coleman v. United States (C.C.A.) 181 F. 599; Wharton v. United States (C.C.A.) 153 F. 876.

ed that constitute a taking, and form the basis of an implied promise to pay.

· Judge Faris said, in United States v. Chicago, Burlington & Quincy Railroad Company:[25] "many cases are to be found holding that no damages can be recovered against the United States in an action under the Tucker Act (28 U.S.C.A. § 41 (20) when no part of the land of plaintiff is actually touched, or actually taken." Since this case is relied upon by plaintiff, it may be here mentioned that it was a condemnation suit, and the question was what constituted just compensation, the taking of the property not being in issue; while the question here is what constitutes a taking.

In Hurley v. Kincaid,[26] the court declared that a landowner in the Boeuf floodway could not enjoin the receiving of bids for the construction of the guide levees, because "if that which has been done, or is contemplated, does constitute such a taking, the complainant can recover just compensation under the Tucker Act in an action at law as upon an implied contract." The court was not called upon to consider the question as to whether there had been a taking. There is nothing in this decision, or in any other case, so far as we are informed, to indicate that the court intended to depart from its well-established doctrine as to what constituted a taking. But this case does hold that an owner may not demand compensation prior to the taking.

It is argued that a taking of plaintiff's property was effected by: (1) The enactment of the Flood Control Act of May 15, 1928; (2) the Proclamation of the President of January 10, 1929, by which he approved the construction of the protection levees in the Boeuf Basin; (3) the adoption of a program, and the assumption by the government of the control of the fuse plug section, because of which, it is claimed, the plaintiff is deprived of the right of "self defense" against a threatened flood, and her land decreased in market value; (4) the act of the government in raising the levee above, below, and across the river from the Cypress creek gap, thereby making it certain that, in the event of a flood which the levees would not withstand, plaintiff's land would be covered with water.

■ It seems to be clearly settled by the adjudicated cases that the passage of a statute, standing alone, does not effect the taking of property. The statute be and is often repealed, and, until it has been executed to the extent of appropriating the land, an owner is not entitled to be compensated.[27] In fact, the government is free to abandon the plan to acquire land at any time before that result is actually consummated.[28] The date of the statute is not the time of the taking. In condemnation, the date of the suit, award or the judgment fixes the time of the taking.

■ The approval of the President to the commencement of the work on the Boeuf floodway is regarded as particularly significant as fixing the time that the government became obligated to compensate the plaintiff. Attention has not been directed to authority for this position. A railroad contended that the statute authorizing government control, followed by the Proclamation of the President, effected a taking of its property, but the Supreme Court held that a mere technical taking does not create the right to receive compensation.[29] The recording by public authority of a map of a proposed system of highways within a certain territory, without restricting the use of lands before the commencement of proceedings for their condemnation, did not constitute a taking.[30]

The fuse plug section of the levee has not been disturbed. But plaintiff asserts that the landowner no longer has the same right to protect the levee that formerly existed. The grade of this levee was established by the Mississippi River Commission, acting under authority duly conferred. The landowners, prior to 1928, had no right to elevate the established grade. There is nothing in the act that restricts the privilege of property owners to participate in a "flood fight" by supporting the river front levee, when it is endangered.

[25] (C.C.A.) 82 F.(2d) 131 loc. cit. 137, 106 A.L.R. 942.

[26] 285 U.S. 95, 52 S.Ct. 267, 269, 76 L.Ed. 637.

[27] Red v. Little Rock Railway & Electric Co., 121 Ark. 71, 180 S.W. 220; Willink v. United States, 240 U.S. 572, 36 S.Ct. 422, 60 L.Ed. 808.

[28] Garrison v. City of New York, 21 Wall. (88 U.S.) 196, 22 L.Ed. 612; 10 R.C.L. 199.

[29] Marion & Rye Valley R. Co. v. United States, 270 U.S. 280, 46 S.Ct. 253, 70 L.Ed. 585.

[30] Bauman v. Ross, 167 U.S. 548, loc. cit. 596, 17 S.Ct. 966, 42 L.Ed. 270.

They did so participate during the 1937 flood. But, even if it were otherwise, that fact would not give rise to the contingency out of which plaintiff would become entitled to the relief sought in this case.

The act of the government in raising the other levees in the vicinity to the 1928 grade, and leaving the prolonged fuse plug section at the 1914 grade, is relied upon as constituting the taking of plaintiff's property. Mention heretofore has been made of the fact that it is not only the Boeuf floodway fuse plug that remains at the 1914 grade, but a section of the levee approximately 15 miles in length, both at the upper and the lower end of the fuse plug proper. So plaintiff's land has the same levee protection as all other alluvial lands in that section. This is not by chance, but by design. The statute so required pending the completion of the floodway. The protection levees for the Boeuf floodway have not been constructed. Consequently, that floodway is not now, and never has been, in an operative condition. In the event of extremely high water, the overtopping of the river front levee would not be confined to the fuse plug proper, but might take place either above or below that section. If water should come over the levee, it would not be confined to the designed channel, but would cover all land of approximately the same elevation. So the project, in the present stage of execution, is not effective to the end designed, and has placed no burden upon plaintiff's land that is not equally shared by all other similar land in that vicinity. Moreover, it was held in Jackson v. United States [31] that raising levees on one side of a river was not, in effect, the taking of land on the other side.

The plaintiff offered much evidence tending to show that the project under consideration had decreased the value of land in the floodway. A satisfactory finding on this subject can hardly be made. It is a fact that the value of land in the Boeuf Basin decreased subsequent to 1928. The plaintiff says this was due to flood control plan. The defendant urges that it was due to high taxes, the depression, the low price of agricultural products, and was by no means confined to the alluvial lands in Southeastern Arkansas. There is no occasion to undertake to determine the extent, if any, to which the project contributed to the decrease in the value of plaintiff's land.

No part of plaintiff's land has been appropriated for use as levee right of way, and no actual entry of any kind or character has been made thereon. No water has been diverted over plaintiff's land, and there has been no overtopping or crevassing of the fuse plug section of the river front levee since the passage of the act in question. There has been no reduction in the grade of the levee protecting plaintiff's land, and no right acquired or sought to reduce this protection. There has been no interference with the plaintiff's possession, occupancy, and use of the said land.

In our opinion, it cannot be successfully contended that plaintiff's land has been appropriated by the defendant, thereby giving rise to an implied contract to compensate the owner.

In view of this conclusion, it is not conceived to be necessary to make any finding as to the additional parties plaintiff.

The court directs that judgment be awarded defendant.

---

[31] 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363.