GLADISH v. DRAINAGE DISTRICT No. 17, MISSISSIPPI COUNTY.

4-9180                                                    230 S. W. 2d 490

Opinion delivered June 5, 1950.

*G. E. Keck* and *Frank Sloan*, for appellant.

*Graham Sudbury*, for appellee.

*Marcus Evrard*, for interveners.

ED. F. McFADDIN, Justice. This litigation was instituted by the appellant, Gladish, filing an action against Drainage District No. 17 of Mississippi County, Arkansas (hereinafter called "District"), and seeking (a) to recover damages for the taking of certain lands in the building of a new levee; and (b) to recover damages because other lands were left outside the new levee. Gladish's tenants also joined as plaintiffs, in order to recover damages for crops destroyed by the new levee. Even though the case was filed in 1940, various unavoidable circumstances necessitated delay; and the cause was not decided by the Chancery Court until October 26, 1949, when a decree was entered denying relief to the plaintiffs and resulting in this appeal by them.

## FACTS

We detail the events in chronological order:

(1)—Through foreclosures and otherwise, the District owned several hundred acres of land protected by the then existing levee; and on November 30, 1936, the District made two contracts of sale, agreeing to sell to Woodard and to Cockerham lands in excess of 700 acres. These contracts provided for annual payments over a period of years and prohibited the purchasers from assigning the contracts without the consent of the District. We will refer to these as "the Woodard and Cockerham contracts."

(2)—For several years prior to 1936 the District had realized that its existing levee was inadequate, and had negotiated with the United States Government for the construction of a new levee to be located farther away from the river than the existing levee. In late 1936 or early 1937 the United States Government offered to construct the new levee if the District would furnish the lands and easements therefor. The District on April 1, 1937, obtained certain instruments—designated and referred to herein as "option contracts"—from Woodard and Cockerham, by the terms of which Woodard and Cockerham, each as second party, agreed with the District, as first party, that:

". . . in consideration of the further sum of $25.00 per acre, to be paid upon the execution and delivery of a General Warranty Deed by the Second Party to the First Party, the Second Party agrees, upon request, at any time within one year from this date, to convey by General Warranty Deed, to the First Party all lands needed by First Party in the construction of its levees and spoil banks; said strip of land commencing on the land side of said levee, 5 feet from the toe thereof and extending to the edge of the borrow pit, including, when finally constructed, the actual levee, berme, borrow pit and a strip of land 5 feet wide on the land side of the levee, over and across the following described land, lying in Mississippi County, Arkansas, to wit:" (Then follow descriptions of lands totaling 376 acres.)

The option contracts also recited that the exact location of the levee and the lands needed by first party would be ascertained and determined by surveys made by United States Government Engineers.

(3)—On August 2, 1937, Woodard and Cockerham, for a valuable consideration, agreed to assign to the appellant, Gladish, their said contracts of purchase of the lands totaling in excess of 700 acres. This agreement recited:

"It is specifically understood and agreed that the Sellers hold their title to said lands under Contracts of Purchase with Drainage District No. 17 and that their

conveyance to the Purchaser will be by the way of an assignment of each of said Contracts, and that said Sellers will in no wise warrant the title to said lands, . . .'' The agreement made no mention of the option contracts referred to in (2), *supra*. Because the purchase contracts executed by the District to Woodard and Cockerham prohibited assignment without consent of the District, it became necessary for such consent to be obtained.

(4)—On November 3, 1937, the District, having learned that Gladish was about to purchase the ''Woodard and Cockerham contracts,'' addressed a letter to Gladish (which he received the next day), containing copies of the Woodard and Cockerham options mentioned in paragraph (3) above. Then on November 23, 1937, the District consented to the assignments to Gladish of the Woodard and Cockerham contracts, but without any reference to the option contracts.

(5)—There is no dispute as to any of the foregoing facts; but we come now to a controversial matter. Sometime prior to April 1, 1938, (and within the year provided for in the option contracts) Mr. Holland (president of the Board of Commissioners of the District) and Mr. Meyer (engineer of the District) went to see Mr. Gladish concerning the option contracts which were to expire on April 1, 1938. That a conversation took place is agreed; but the language and result of the conversation are sharply disputed. The District contends that its said representatives at that time exercised the option contracts for the District. Mr. Gladish insists to the contrary. The Chancellor found that the District in effect exercised its option contracts in the said conversation; and this finding will be discussed in Topic I, *infra*.

(6)—Sometime in 1939 the District actually entered on some of the lands that Mr. Gladish had purchased from Woodard and Cockerham and constructed the new levee on and across said lands, thereby taking 24.46 acres of Gladish's land. On April 4, 1940, Mr. Gladish and his tenants filed this suit, seeking the relief heretofore mentioned. The District, by its answer and cross complaint, asked specific performance of the said option contracts. The learned Chancellor awarded the District specific per-

formance of the option contracts and refused Mr. Gladish and his tenants the damages claimed. From that decree comes this appeal with a transcript of 730 pages and printed abstracts and briefs of 278 pages.

## OPINION

I. *Did the District Legally Exercise Its Options?* For the purposes of this opinion we may assume, without deciding, that the options were valid in every respect[1] and binding on Gladish as a purchaser with notice. Nevertheless, we hold that the District did not exercise the options in the manner required by law.

The evidence shows that when the option contracts were signed on April 1, 1937, the District had not then obligated itself to the United States Government to furnish the right-of-way; so naturally the definite location of the levee could not have been known at that time, although stakes had been driven for a tentative location. It was not until November 12, 1937, that the District executed the resolution for coöperation with the Federal Government. When Messrs. Holland and Meyer went to see Mr. Gladish (as stated in fact paragraph (5), *supra*), they were trying to get him to extend the time of the options which he refused to do.[2]

---

[1] Appellants cite and strongly rely on *Hogan* v. *Richardson*, 166 Ark. 381, 266 S. W. 299, as holding that an option instrument was a unilateral offer when the consideration for the option was only one dollar. In *Hogan* v. *Richardson*, the instrument stated no time limit during which the option would be kept open: the decision could well have been put on that point and would not have been contrary to the weight of authority; which is to the effect that an option contract for one dollar is valid. In 55 Am. Jur. 504, the rule is stated: "The inadequacy of the consideration does not affect the binding effect of the option. This is the rule generally applied in case of options given in consideration of one dollar." See, also, 66 C. J. 494 and 1 Williston, "Contracts" (Rev. Ed.), §§ 61 and 115.

[2] We give the testimony of Messrs. Holland, Meyer and Gladish as to the conversation:

(a)—Mr. Holland's testimony was:

"Q. Just what was your conversation at that time?

"A. The substance of what he said was that he was not going to extend the option, and then we told him that we wanted to exercise the option that bound him, that we had with the other parties, and I asked him if it would be necessary for us to do whatever was necessary under the option, and he said, no, he wouldn't recognize it. We wanted him to extend it like the rest of them were, and when he

wouldn't do that, we informed him it was our contention that it did bind him with the other parties.

"Q. Was that all that was said? Did you tell him what land you wanted to take? Did you tell him what lands would be in the floodway? Had the District made its survey at the time this conversation took place?

"A. I don't remember whether it had or not. I know this, that Mr. Gladish knew about what the Government was going to do the same as I did, before he bought the land.

"Q. Did you know definitely what lands would be in the Government right-of-way? There would be no way of knowing that until the Government ran the line, and the Government hadn't done that on April 1, 1938, had it?

"A. I don't remember.

"Q. What I am getting at is this, that the reason why you said you asked other parties to extend their options, or renew their options, was because the time was about to elapse without the Drainage District knowing what lands would be needed?

"A. I guess it is, I don't remember when those surveys were made.

.    .    .    .    .

"Q. The last time you talked to Judge Gladish, or on any one of the occasions you talked to him about these options, did you know the exact number of acres you needed and the amount of money that would be required to pay for it under these options?

"A. Johnny (i. e., Mr. Meyer) might have.

"Q. As far as you were concerned, you didn't?

"A. No, sir."

*    *    *    *    *

(b)—Mr. Meyer's testimony was:

"Q. At the time you and Judge Holland interviewed Judge Gladish the last time, what did he say he was going to do with reference to this option?

"A. As I remember it, he said he wasn't going to do anything about it.

"Q. You say you can't give the exact conversation?

"A. No, I can't give the exact conversation.

"Q. For the purpose of refreshing your memory, I will ask you whether or not Judge Holland proposed to him that if he would comply with the option that you would tender the money or do whatever was necessary to carry it out?

"A. Yes, sir.

"Q. What did he say to that?

"A. In so many words he said: 'Nothing doing.' "

*    *    *    *    *

(c)—Mr. Gladish's testimony was:

"Q. It has been testified on direct examination of Johnny Meyer and Judge Holland that they did—some two or three weeks before the options expired by their terms on April 1, 1938—have a conversation with you relative to the option.

"A. They did.

"Q. At that time—will you state the substance of that conversation?

"A. Well, the substance of all the conversations was to get me to renew the contract.

"Q. Did they offer you either orally or in writing a specific description of any rights-of-way or flowage rights over your land?

"A. No, sir.

. . . . .

"Q. It was testified by Johnny Meyer that he and you had discussed at some time where the new levee was to be and what acreage was involved and in general that you knew the descriptions of the lands to be sought by the District for that purpose. Is that true or not?

"A. He never discussed anything with me about that right-of-way until the engineers went down and went across my land around the first of the year 1939."

Mr. Gladish testified that when the District, on November 23, 1937, executed the consent to the assignment to him of the Woodard and Cockerham contracts and made no reservation as to the option contracts, he considered the option contracts as thereby terminated. But regardless of his understanding of the legal effect of the assignment, Mr. Gladish refused to extend the time in which the District could exercise the option contracts; and the District never informed Mr. Gladish—prior to April 1, 1938—what specific lands were to be described in the deed required by the option contracts.

When we consider the quoted clause in factual paragraph (2) (that the deed was to be made within one year) with the subsequent clause in factual paragraph (2) (that the description of the lands for the levee was to be ascertained by survey of the United States Engineers), it is clear that the option contract contemplated that the said deed was to actually describe the surveyed lands. The description of such lands was not furnished Mr. Gladish; and this omission probably accounts for the testimony of Mr. Holland relating to an ''extension'' of the option, which Mr. Gladish refused to give. Mr. Gladish is supported to some extent by the fact that the auditor of the District wrote Mr. Gladish a letter in January, 1939,[3] which, after describing the lands, said *inter alia*:

''Official notice is hereby given that this District is now ready to exercise its option on the above described contract of purchase, . . .''

This letter, written by the District in 1939, is rather clear evidence that the District, at the time of writing that letter, did not consider that it had theretofore exercised its rights under the option contract. Those rights, unless extended, had expired on April 1, 1938; and we find no evidence of any extension.

So we conclude that in the conversations prior to April 1, 1938, the District was unable to get Mr. Gladish

[3] This letter related primarily to a provision in the option contract regarding lands in front of the new levee, which will be discussed in Topic III, *infra*. But the significant point is that it referred to the fact that the District was then preparing to exercise option contracts; and that carries with it the idea that the option had not been exercised theretofore.

to extend the option; and that the District failed to advise him what lands he was to deed to the District or the amount he was to receive therefor. This description of the right-of-way was information that the District should have furnished Gladish; and this it failed to do. In short, the District failed to pursue the course which the law requires of one who is seeking to exercise an option. See *Indiana & Arkansas Lumber & Mfg. Co.* v. *Pharr,* 82 Ark. 573, 102 S. W. 686; *Zearing* v. *Crawford,* 102 Ark. 575, 145 S. W. 226; *Lane* v. *Jackson,* 135 Ark. 384, 205 S. W. 650; *Newman* v. *Kellogg,* 195 Ark. 12, 110 S. W. 2d 693; and *Pope* v. *Shannon,* 199 Ark. 1148, 138 S. W. 2d 382. So we hold that the District failed to exercise its option in the manner required by law, and was not entitled to a decree of specific performance of the option contracts.

II. *Damages Arising Because of the Taking of the Lands.* The District contended—and the Chancery Court found—that the option contracts provided the measure of compensation for the lands taken by the District. When we deny—as we do—specific performance of the option contracts, then Mr. Gladish is entitled to recover the damages allowed by law for the taking of his lands.

Section 4941, Pope's Digest, was the applicable Statute at the time Gladish's lands were actually taken in 1939.[4] Under such Statute, Mr. Gladish is entitled to recover (a) the market value of the land at the time it was actually occupied, (b) damages for the inconvenience of crossing from one portion of the tract taken to the other portion of the tract, and (c) damages sustained on account of the obstruction of natural drainage.[5] We discuss these:

(a)—It is admitted that 24.46 acres of Mr. Gladish's land were actually taken by the District. Mr. Gladish claimed that this land was worth $125 per acre, or a total of $3,057.50; and Mr. Gladish and his tenants claim crop and incidental damages totaling $506.20. We find that

[4] Sec. 8 of Act 177 of 1945 (now found in § 35-1108, Ark. Stats. 1947) is similar in all material matters here involved to § 4941, Pope's Digest; but this cause of action arose prior to the adoption of the 1945 Act.

[5] See the recent case of *Staub* v. *Mud Slough District,* 216 Ark. 706, 227 S. W. 2d 140, on this third element of damages.

the preponderance of the evidence supports these figures which total $3,563.70.

(b)—As to the inconvenience of crossing from one portion of the tract to the other portion, a study of the evidence convinces us that $1,000 is an adequate amount for this element of damage.

(c)—As to the obstruction of natural drainage, the evidence is too indefinite to justify any award. Mr. Gladish testified only as to the construction of ditches to take care of seep water. We find no substantial evidence that any natural drainage was obstructed by the actual construction of the levee.

So we conclude that the total damages arising from the taking of the land amount to $4,563.70.

III. *Damages Claimed Because the New Levee Left Certain Lands Unprotected.* Mr. Gladish claims that he is entitled to approximately $15,000 additional damages, because the new levee was set back some distance from the old levee; and some of his lands that had been protected by the old levee are left unprotected because of the location of the new levee. In making this claim for damages he relies on either of two points: (a) that the case at bar comes within the rule of law announced in *Garland Levee District* v. *Hutt,* 207 Ark. 784, 183 S. W. 2d 296; and (b) that the case at bar comes within the language of Act 14 of the Second Extra Session of the Legislature of 1932. We find that Mr. Gladish is not entitled to recover on either of these points.

(a)—The evidence does not bring this case within the rule of law announced in *Garland Levee District* v. *Hutt, supra.* In *City Oil Works* v. *Helena,* 149 Ark. 285, 232 S. W. 28, a setback levee was constructed, leaving lands unprotected by the new levee that had been formerly protected by the old levee; and we held that such fact in itself gave the owner of the unprotected land no cause of action for damages against the District that constructed the new levee. To the same effect is *Rauls* v. *Costner,* 201 Ark. 155, 143 S. W. 2d 1090, in which we quoted from a headnote to *McCoy* v. *Board,* 95 Ark. 345, 129 S. W. 1097, 29 L. R. A., N. S., 396:

"A levee district, which builds a levee so as to protect lands from overflow of the waters of a stream at floodtime, will not, under Const. 1874, Art. 2, § 22, providing that private property shall not be 'damaged for public use without just compensation therefor,' become liable for injuries to land lying between the levee and the river resulting from the flood water being raised higher between the levee and the river than before the levee was constructed."

Such was our recognized holding when *Garland Levee District* v. *Hutt, supra*, was decided. That case recognized the holdings in the cases previously mentioned but said:

". . . There was some evidence in this case that the lands of appellees lying between the new levee and the river were, under the plans of the new levee project as actually executed, to be used as a basin to receive flood waters in time of overflow from Red River, which flood waters would act as a cushion against the current of the overflow and thereby protect the new levee.

"On a retrial of this case the jury should be instructed that, if they found from a preponderance of the evidence that under the plans for the new project as actually carried out the said lands of appellees were to be used as a means of affording protection in the manner above set forth to the new levee, then the landowners would be entitled to recover as damages for the imposition of this servitude or easement on their land the difference between the fair market value of their land before the new levee was built and the fair market value thereof after the construction of the new levee."

In the case at bar the evidence fails to show that Mr. Gladish's lands in front of the new levee are used in any such way as to justify an award of compensation. At the downstream, or lower end of the old levee, and on lands located below those of Mr. Gladish, a section of the old levee has been removed so that any water accumulating on the lands between the old and the new levee can flow off naturally. There was no complete removal of the old levee in front of Mr. Gladish's lands, nor was the old

levee removed upstream so as to allow the water to "bottleneck" between the old and the new levee in front of his land, as was unsuccessfully claimed to be the situation in *Rauls* v. *Costner, supra.* Rather, in the case at bar, the break in the old levee was downstream from Mr. Gladish's lands, so that whatever water accumulated between the old and the new levee would the more rapidly drain from the land when the river subsided. We conclude, therefore, that the case of *Garland Levee District* v. *Hutt, supra,* is not factually applicable to the claim of Mr. Gladish in the case at bar.

(b)—Neither does Act 14 of the Second Extra Session of 1932 afford any relief to Mr. Gladish. In *Garland Levee District* v. *Hutt, supra,* the landowner sought to claim relief under the said Act, and our language in that case is applicable here:

"Nor can it be said that Act 14 of the second extra session of 1932 is applicable to the case at bar because, by the plain provisions of that act, it is limited in its application to cases where a written agreement had been made by the board of commissioners to compensate landowners for damages resulting from the abandonment of the existing levee and the building of a set-back levee. No such agreement is alleged or proved in this case."

It is true that the option contract of April 1, 1937, (as heretofore referred to in paragraph (2) of the Facts) gave the District an option to take lands for flowage rights upon the payment of an amount stated in the said option contract; but Mr. Gladish has—successfully in this Court—established the fact that the option contract expired. He cannot defeat one portion of the option contract and then successfully rely on another portion: it was an indivisible instrument. Since the option contract expired, there remained no valid contract between Mr. Gladish and the District, whereby the Act 14 of the Second Extra Session of 1932 may be invoked by the landowner. Therefore—under the facts presented in this case —Mr. Gladish is not entitled to recover any damages, on the claim that some of his lands were left unprotected by the new levee.

## CONCLUSION

The decree of the Chancery Court is reversed, and the cause is remanded, with directions to enter a decree for appellants for $4,563.70, with interest at six per cent. from August 31, 1939.[6] As to costs, Woodard and Cockerham are entitled to recover from Mr. Gladish all their costs. The appellants are entitled to recover from the District all their other costs.

[6] Interest runs from the taking. See *Newgass* v. *Railway*, 54 Ark. 140, 15 S. W. 188. The testimony merely discloses that the entry was "August, 1939," so we have fixed it as the last day of the month.