BOARD OF DIRECTORS, ST. FRANCIS LEVEE DISTRICT
v. MORLEDGE.

5-1949—1954                                    332 S. W. 2d 822

Opinion delivered March 14, 1960.

*F. N. Burke, Jr., Daggett & Daggett,* for appellant.

*Carroll C. Cannon,* for Appellee *Gatling, Shaver & Shaver,* for Appellee *Morledge, et al., Giles Dearing* for Appellee Thomas.

ED. F. McFADDIN, Associate Justice. These appeals stem from condemnation proceedings instituted by the Board of Directors of the St. Francis Levee District against the appellee landowners in Cross County and St. Francis County. The Levee District is condemning a right of way approximately 1,400 feet wide for a new river channel. The cut for the new river will be 400 feet wide at the top and 180 feet at the bottom, and will be constructed on a 3 to 1 slope. The depth of the cut for the river will vary from 24 feet to 45 feet.

When the Levee District filed the condemnation cases, its appraisers, proceeding under Act No. 177 of 1945 (§ 35-1102 *et seq.* Ark. Stats.) and Act No. 249 of 1949 (§ 21-805 Ark. Stats.), proceeded to make appraisals. The landowners excepted to the appraisals, claimed that all elements of damages had not been considered, and asked much larger damages. As a result of the trial in the Chancery Court, the landowners received larger damages; and it is from these decrees that there are these

appeals. Below we tabulate the name of the landowner, the amount fixed by the appraisers, and the amount as finally awarded each landowner by the Chancery Court:

| Landowner | Appraiser's Figures | Amount Awarded by Chancery Court |
|---|---|---|
| Morledge | $16,126.50 | $102,450.00 |
| Thomas | 9,651.63 | 57,700.00 |
| Edgar | 4,755.00 | 45,085.00 |
| Dillon | 12,629.75 | 36,705.00 |
| Gatling | 20,161.88 | 32,089.00 |

The trial in the Chancery Court consumed more than nine days, and the Chancellor made six visits of inspection to the premises. The cases of Morledge, Thomas, Edgar, and Dillon were tried on the same theory of damages; but the District and Gatling stipulated for a trial on a different theory of damages. So it became necessary for the Chancellor to make separate findings in the Gatling cases. We consider first the cases of Morledge, Thomas, Edgar, and Dillon.

The learned Chancellor reduced his findings to writing; and they are so clear that we copy excerpts:

## CHANCELLOR'S FINDINGS IN THE CASES OF MORLEDGE, THOMAS, EDGAR, AND DILLON.

"These causes originated in the Circuit Courts of Cross and St. Francis Counties and were transferred to this court when the defendant landowners raised the question as to the right of the District to condemn their lands under the power of eminent domain. This court having thus obtained jurisdiction and having found that the District had the legal right to condemn and acquire the lands as a right of way for levee purposes must needs retain jurisdiction for any and all purposes. The Chancellor must now constitute himself a jury for the purpose of assessing damages, if any be due, for the taking of private property for a public purpose. These cases were consolidated by agreement for the purpose of trial. The

factual background in each case is practically and basically the same though there are some differences in the pleadings in the case of the *District v. Thomas Gatling, et al.,* which necessitate separate findings in that case.

"All of the lands involved are located in what is called 'Clark Corner Cutoff'. This is one of the segments of the District's plan of levee and drainage improvements in the St. Francis and Mississippi River area. The District has proceeded in the condemnation proceedings under the provision of Act 249 of the Acts of the Legislature for the year 1949. The Chancellor has previously held that there had been a substantial compliance with the provisions of this Act on the part of the District and that it had by appropriate action become the sponsor of the project known as 'THE ST. FRANCIS RIVER VALLEY PROJECT', which is now being constructed by the U. S. Government pursuant to the authority of the Acts of Congress. The full details of the plan or project are contained and set forth in House Document No. 132, 81st Congress, First Session. A copy of said document forms a part of the record in the cases. * * *

"The overall purpose of the project is to provide facilities to carry off and contain all surface waters falling within an area including Southeast Missouri and Northeast Arkansas within the St. Francis and Mississippi watershed. The main purpose of the plan is to prevent any flood waters (either head water or back water) from the Mississippi River or the St. Francis River from reaching any part of the vast area in Missouri and Arkansas lying east of Crowley's Ridge on the west and the Mississippi River on the East except within a narrow floodway along the east side of Crowley's Ridge. When the project is completed and the improvements made it will protect from flood waters from either river all of the State of Missouri and Arkansas which lie in the St. Francis River watershed, except for the narrow floodway. The project plans contemplate that the lands belonging to defendants will be located within this narrow floodway * * * This floodway will be contained

on the west by Crowley's Ridge and on the east by a levee to be constructed under the plans. The effect of the project will be to provide for two distinct drainage districts in the valley where only one has existed previously * * *

"Construction, according to the plan, began several years ago and the new levee to form the east boundary of the floodway has been completed from the Mississippi to Madison, Arkansas, some few miles to the south of Clark's Corner Cutoff. This levee will be built to grade through the Clark Corner Cutoff area though the exact location in the area has not been definitely determined at this time. The new river through the area is now under construction.

"In the Clark Corner Cutoff segment with which we are concerned St. Francis River makes a wide bend of some nine miles and flows to the east of all the lands involved in the action. Under the plans which are now in the process of being carried out a new river will be cut almost straight across this bend and through the lands of defendants. This new river will be 400 feet or more wide at the top and 180 feet or more at the bottom and will be constructed on a 3 to 1 slope. The depth of the cut for the river will vary from 45 feet to 24 feet toward the south end. The district will utilize Sand Slough and Horse Shoe Lake as a part of the cut for the new river and the distance around the bend will be shortened some four miles or more.

"The new levee will be built across the river so as to create a dam at the north end of the area and also at the south end of the area and will cut off the flow of water through the old channel of the river and force the flow into the new river. The new river will bisect the lands of the defendants so that some of the farms will be divided by the new river. While the exact location of the levee to form the floodway has not been definitely determined at the time of trial, it must necessarily be located between the old river and the new river and most, if not all, of

the lands of the parties will be placed in the floodway to be created between Crowley's Ridge and the new levee and the lands must bear this additional servitude. From the maps and plats filed with the testimony, it appears that at this point this floodway will be from two to three miles wide.

"In each case the District filed its petition for condemnation and in each case the appraisers made and filed their award of damages. In each instance the appraisers made the award of damages for the value of the lands actually taken for agricultural purposes only and made no award for any other damage of any kind which might result from the condemnation. Exceptions were duly filed to the awards made by the appraisers and in the pleadings the defendants alleged and set forth in detail their claims for damages for the taking and damaging of their lands.

"The record in the case discloses that defendant Morledge operates his farm as one unit consisting of 1,018 acres of cultivated land and 458 acres of woodland. The farm is well improved and the improvements include a cotton gin, warehouse, store building, two large residence buildings, and many barns and tenant houses. A large lake of approximately 26 acres of water is located on the right of way taken and it has been used to irrigate some 300 acres or more of crop land and furnish water for a valuable irrigation system. The new river will destroy the lake and will divide this farm into almost equal parts some parts of which will be isolated by the new river. The headquarters (gin, store, etc.) will be located on the west side of the new river. The actual land condemned consists of 56.11 acres of cultivated farm land and 88.48 acres of woodland including the lake.

"The Dillon farm consists of 310 acres of crop land and 161 acres of woodland and pasture. The new river will divide the farm so as to isolate approximately 27 acres from the other lands in the farm. The action con-

demns 54.86 acres of crop land and 30.70 acres of woodland and pasture land.

"The Edgars farm consists of 441 acres of cultivated land and 334 acres of woodland. The District by this action condemns 21.39 acres of crop land and 12.72 acres of woodland. These lands are located toward the south part of the area and the lands which remain after the condemnation will all lie east and south of the new river.

"The Thomas farm consists of approximately 800 acres of land of which approximately 600 acres are productive crop land and 200 acres are wooded lands and pasture lands. The Thomas lands lie in the West and southernmost part of the bend and the outlet for the new river is located on his land. The District condemns 37.87 acres of crop land, 3.98 acres of pasture land and 44.79 acres of wooded land. Practically all the remaining land in the farm lies between the new river and Crowley's Ridge.

"All of these farms lie in the area which will comprise the floodway to be constructed. The District will have constructed two bridges across the new river, one at the north end of the area and one near the south end.

"Nine full days were consumed in the actual trial of the causes and many witnesses have testified at great length. The record with the testimony and exhibits is quite voluminous. There are many conflicts in the testimony which cannot be reconciled. The Engineers who appear as witnesses for both sides of the litigation are truthful men of excellent training and long years of experience in their field, yet there is much of their testimony which is conflicting. The experts called by defendants say that the effect of the project when completed will be of great benefit to those lands in the watershed which lie to the east of the new levee to be constructed, but that the lands belonging to the defendants which are involved in this action will be greatly damaged and the value of defendants' land lying along the new river and

within the floodway to be constructed will be greatly diminished if not destroyed. The engineers for the District testify that little if any damage will result to defendants' lands and that any such damage at this time and stage of construction could not be ascertained and would, therefore, be a mere speculation. There is much testimony as to the value of the lands actually taken, as well as to the value of the lands which remain after the taking.

"The testimony of defendants and their witnesses points out many elements of damage which will result from the taking that have not been taken into consideration by the appraisers and for which no compensation has been allowed by them. To enumerate these alleged elements of damage in these findings would extend the length unreasonably. The testimony is to the effect that the market value of the lands which remain to defendants has been diminished by from one-third to one-half of its value by reason of the action brought by the District. There is testimony to the effect that the lands themselves, as well as the crops to be planted thereon, have lost their value as security for loan purposes because of plaintiff's condemnation proceedings.

"In addition to the record testimony the Chancellor, at the request of the parties, has inspected the premises and lands affected on six different occasions during the pendency of the action. The Chancellor has covered the entire area on foot and has inspected that part of the construction of the ditch or new river which has been affected, as well as to note the type and condition of the land and the improvements thereon. The information and knowledge acquired by these visitations has been valuable in weighing the testimony and in arriving at a conclusion on the facts in the case.

"The court has concluded that in addition to the value of the lands taken and the damages thus sustained, the defendants have been and will be damaged by reason of the levee works constructed and to be constructed to

the remaining part of their farms and that the awards of damages made by the appraisers will not adequately compensate these defendants for the value of the lands actually taken and for the damages they have sustained.

"The Constitution of our State provides that no private property shall be taken, appropriated, or damaged for public use without just compensation therefor. It appears to the Chancellor to be the law in cases of this kind that when a part of a tract of land be taken for public use with no damage to the remainder, the market value of that part actually taken is the measure of damages. When a part of a tract of land be taken and damages result to the remainder, then the measure of damages is the difference in market value of the entire tract before and after the taking or damaging. Since the Chancellor has found that there are substantial damages resulting to the remainder of defendants' lands after the taking, it becomes the duty of the court to ascertain the market value of the whole land or farms in each instance before the taking and to ascertain the market value of that portion remaining after the taking and the difference would be the amount of damages suffered by the defendants in this case.

"The District insists that the defendants should be limited in the award of damage to the market value of the lands actually taken and that any other damage, if any, would be speculative at this time and would be until the project or plan has been fully completed. The District points at Act 177 of the Legislature for the year 1945 and Act 249 for the year 1949, and to the recoverable damages therein enumerated as a limitation of damages which the courts can allow compensation for damages sustained in condemnation proceedings for levee purposes. However, the Chancellor finds, under the facts and circumstances attendant in this case the damages awarded by the appraisers who were supposedly proceeding under the above cited acts would not meet the Constitutional requirement, the provisions of said Acts,

or adequately afford these defendants just compensation for the damages they have sustained.

"In the case of *District* v. *George B. Morledge, et ux*, the Chancellor finds that the farm before the taking had a market value of $421,800.00 and immediately after the taking the remaining portion of the farm had a market value of $319,350.00, a difference of $102,450.00, for which said defendants should have judgment.

"In the case of *District* v. *Fred Thomas, et al.*, the court finds that immediately before the taking this farm had a value of $160,000.00 and after the taking the remaining portion had a value of $102,300.00, a difference of $57,700.00, for which said defendants should have judgment.

"In the case of James T. Edgar, *et ux*, the farm immediately before the taking had a market value of $120,925.00 and after the taking the remaining portion had a market value of $75,840.00, a difference of $45,085.00, for which said defendants should have judgment.

"In the case of John Dillon, *et al.*, the Chancellor finds that the value of this farm before the taking had a market value of $85,550.00 and after the taking the remaining portion had a market value of $48,845.00, a difference of $36,705.00, for which said defendants should have judgment.

"The said judgments shall bear interest from the date of the filing of the petition for condemnation in each case at the rate of 6% per annum, and the costs of the proceedings shall go against the plaintiff District.

"The attorneys representing said defendants shall prepare a proper precedent in accordance with these findings and submit the same to counsel for approval as to form. * * *

"Dated 8/2/58   /s/ Ford Smith, Chancellor."

## OPINION OF THIS COURT

Chancery decrees were entered in each case in accordance with the findings of fact, as previously copied; and from such decrees the District brings this appeal, presenting a total of thirteen points,[1] insofar as involve

[1] These points are:

(1) The Court erred in admitting testimony concerning the effect of the proposed plan of improvement, the threat of the construction of the proposed levee, and in considering these matters as elements of damage.

(2) The Court erred in considering and awarding judgment for any element of damage other than those elements set out in Ark. Stats. 35-1103.

(3) The Court erred in awarding judgment for the damages caused by the proposed construction of a levee, since the cause of action therefor, if any, does not arise until the levee is constructed and the damage accrues.

(4) The damages awarded by the Chancellor are not supported by substantial evidence, are unauthorized by law, and are excessive.

(5) The Court erred in admitting testimony concerning the damage arising from the construction of the ditch to the lands of the defendants other than the lands actually taken, in considering this as an element of damage in these cases, and in awarding judgment therefor.

(6) The Court erred in admitting testimony concerning the damage arising from the proposed construction of the levee to the lands of the defendants other than the lands actually taken, in considering this as an element of damage in these cases, and in awarding judgment therefor.

(7) The Court erred in considering as an element of damage in this case the damages which might result in the future from the construction of the ditch.

(8) The Court erred in considering evidence tending to establish damages accruing to the defendants by reason of destroying their right to irrigate from the waters of Sand Slough and Horseshoe Lake for the reason that, as a matter of law, this proceeding would in no wise affect their right to such use of the water.

(9) The Court erred in finding that the new river would divide the Morledge farm into two equal parts.

(10) There is no substantial evidence to support the Court's finding that the Morledge farm before the taking had a market value of $421,800.00, and immediately after the taking the remaining portion of the farm had a market value of $319,350.00, a difference of $102,-450.00, and in rendering judgment against the appellant for said amount.

(11) There is no substantial evidence to support the Court's finding that the James T. Edgar farm before the taking had a market value of $102,925.00, and immediately after the taking the remaining portion of the farm had a market value of $75,840.00, a difference of $45,-085.00, and in rendering judgment against the appellant for said amount.

(12) There is no substantial evidence to support the Court's finding that the John Dillon farm before the taking had a market value of $85,550.00 and immediately after the taking the remaining portion of the

the claims of Morledge, Thomas, Edgar, and Dillon. We combine and discuss these points in three topic headings.

I. *Constitutional Protection Afforded The Landowner.* Article 2 § 22 of the Arkansas Constitution says: "* * * private property shall not be taken, appropriated or damaged for public use, without just compensation therefor". When the State, or any of its subdivisions, or any public utility, exercises the power of eminent domain, then the owner of private property so taken, appropriated, or damaged for the public use, must receive just compensation therefor. The market value of property taken for public use is to be determined by its availability for all valuable purposes. *Gurdon & Ft. Smith Rd. Co.* v. *Vaught,* 97 Ark. 234, 133 S. W. 1019. The recovery is not only for the land taken, but also for the damages to the balance of the appellee's land, if any, caused by the taking. *Ft. Smith L. & T. Co.* v. *Schulte,* 109 Ark. 575, 160 S. W. 855.

By a long line of decisions we have established that the determination of the damage, in cases like these, is to be measured by what the property was reasonably worth before the taking, and what the remainder of the property is worth after the taking. As early as *Little Rock Miss. River & Tex. Ry.* v. *Allen,* 41 Ark. 431 (decided in 1883), we approved this statement of the law: "The correct rule for measuring damages is to determine the value of the whole land without the railway at the time the same was built, then find the value of the portion remaining after the railway is built, and the difference between the two estimates will be the true compensation to which the party owning the land is entitled". There are many cases to like effect. We cite only a few: *Newport Levee Dist.* v. *Price,* 148 Ark. 122, 229 S. W. 12; *Herndon* v. *Pulaski*

---

farm had a market value of $48,845.00, a difference of $36,705.00, and rendering judgment against the appellant for said amount.

(13) There is no substantial evidence to support the Court's finding that the Fred Thomas farm before the taking had a market value of $160,000.00 and immediately after the taking the remaining portion of the farm had a market value of $102,300.00, a difference of $57,700.00, and in rendering judgment against the appellant for said amount.

*County*, 196 Ark. 284, 117 S. W. 2d 1051; *Pulaski County* v. *Horton*, 224 Ark. 864, 276 S. W. 2d 706; *Ark. State Highway Comm.* v. *Fox*, 230 Ark. 287, 322 S. W. 2d 81. Tested by the language of the Constitution and our holdings in pursuance of it, it necessarily follows that the landowner is entitled to all the damages sustained because of the taking, and the Legislature has no power to specify a few items of damage and deprive the landowner of the other damages that he has sustained.

The appellant insists that the Legislature, by Act No. 177 of 1945 (§ 35-1101 Ark. Stats.), and by Act No. 249 of 1949 (§ 21-805 Ark. Stats.), has named five items of damage, in condemnation cases like those here involved, and that the landowner is limited to those five items of damage. The first four are stated in Act No. 177 of 1945 and are: (1) "fair market value of the land appropriated"; (2) "damage which the construction of the levee will cause by the obstruction of natural drainage"; (3) "inconvenience of passing over the levee, ditch, drain, or canal"; and (4) "the value of crop and houses on the right of way injured or destroyed". The fifth element of damage is set out in Section 2 of Act No. 249 of 1949, and is: "* * * damages shall be paid for any easement or flowage right or increased use or servitude. * * *"

We hold that the Legislature had the right to call the attention of the condemnor to these five elements of damage as particularly worthy of consideration; but that it was beyond the power of the Legislature to limit the landowner to these five elements of damage as mentioned in the two Acts. This holding has already been indicated in the case of *Staub* v. *Mud Slough Drainage Dist.*, 216 Ark. 706, 227 S. W. 2d 140; and there is nothing in *Gladish* v. *Drainage Dist.*, 217 Ark. 411, 230 S. W. 2d 490, or *Person* v. *Miller Levee Dist.*, 218 Ark. 86, 237 S. W. 2d 38, which indicates to the contrary.[2] The landowner is en-

---

[2] In the Gladish case no elements of damages were claimed except those listed in the Statute; and in the Person case, the question was whether the jury verdict was sustained by the evidence.

titled to all the damages which may reasonably flow from the taking of his property; and the Chancery Court acted properly in ascertaining the total value of the landowners' property before the taking and the total value after the taking, in order to determine the damages.

II. *Floodway Damages*. This is the point that has given us the most serious concern. In offering evidence of the damages, the landowners (Morledge, Thomas, Edgar, and Dillon) showed by the plans of the Engineers, by the Congressional reports, and by various other matters of evidence, that the total overall plan of the St. Francis River Basin was: (a) to construct this new river channel through the lands of these parties; (b) to use Crowley's Ridge as the west levee of the new channel; (c) to construct a new levee several miles east of the new channel; and (d) to have all of the lands in between Crowley's Ridge and the new levee as the floodway of the St. Francis River Basin. The landowners insist that the all-over plan for the St. Francis River Basin is the construction of a floodway, and that the taking of the landowners' property for the new channel of the St. Francis River is the condemnation proceeding, at which time they must obtain all of the damages that will result, because the making of the new channel is the first step in the floodway damage which will inevitably follow.

The appellant Levee District insists that neither the location nor the height of the east levee has been determined. Furthermore, the District contends that the new channel may be so satisfactory that no east levee will ever be built. Based on these and other contentions, the Levee District insists that the matter of floodway damages cannot be determined in this litigation because floodway damages will arise when, as, and if, the east levee is constructed; and to support its contentions the District cites the following cases and texts; *Sain* v. *Cypress Creek Drainage Dist.*, 161 Ark. 529, 258 S. W. 637; *Watson* v. *Harris*, 214 Ark. 349, 216 S. W. 2d 784; *Sponenbarger* v. *U. S.*, 21 F. Supp. 28, 101 F. 2d 506, 308 U. S. 256, 84 L.

Ed. 230, 60 S. Ct. 225; *Danforth* v. *U. S.*, 308 U. S. 271, 84 L. Ed. 240, 60 S. Ct. 231; *Willink* v. *U. S.*, 240 U. S. 572, 60 L. Ed. 808, 36 S. Ct. 422; *U. S.* v. *Dickinson,* 152 F. 2d 865; *Hempstead Warehouse* v. *U. S.*, 98 F. Supp. 572; 18 Am. Jur. p. 772 "Eminent Domain" § 144.

The Chancery Court agreed with the landowners and the award to each of them included floodway damages. Such ruling of the Chancery Court is challenged by the appellant. The opinion of the learned Chancellor, as heretofore copied, completely answers the contentions of the District:

> "Construction, according to the plan, began several years ago and the new levee to form the east boundary of the floodway has been completed from the Mississippi to Madison, Arkansas, some few miles to the south of Clark's Corner Cutoff. This levee will be built to grade through the Clark Corner Cutoff area though the exact location in the area has not been definitely determined at this time. The new river through the area is now under construction. * * * From the maps and plats filed with the testimony, it appears at this point this floodway will be from two to three miles wide."

The foregoing excerpts from the Chancellor's opinion show most clearly why the cases and authorities relied on by the appellant (as previously listed) are distinguishable, on the facts, from the case at bar. For instance, in the case of *Sponenbarger* v. *U. S. (supra),* the lands were along the Mississippi River and were inundated in excess of fifteen feet in the 1927 flood. Thereafter, Congress adopted the so-called Jadwin Plan, whereby existing levees protecting the Sponenbarger lands were left at existing heights, but levees across the river were raised so that in case of flood the Sponenbarger land would, in effect, be a floodway; and the adoption of such plan was claimed to be a "taking" of the Sponenbarger land so as to subject the United States to liability for damages. The District Court held that there was no liability; the

Court of Appeals reversed; and the United States Supreme Court agreed with the District Court that there was no liability. But in the *Sponenbarger* case the United States Supreme Court listed and adopted two findings of the District Court which clearly differentiate the *Sponenbarger* case from the case at bar: (1) "The United States has not caused any excessive flood waters to be diverted from the Mississippi through the proposed Boeuf fuse plug (at Cypress Creek), or floodway, and respondent's property has not been subjected to any servitude from excessive flood waters which did not already exist before 1928"; and (2) "no work was ever commenced or done within the area of the proposed Boeuf flood-way; and the fuse plug heading into it was never established. This floodway as a whole has been abandoned, * * *" In the case at bar: (1) the basic plan is a diversion of water by a new channel through the lands of these landowners; and (2) the channel is constructed and the east levee has been built a short distance downstream from the lands' herein. It would unduly prolong this opinion to discuss each case and textbook cited by appellant; we conclude that none is in point to the case at bar.

There is detailed and voluminous testimony in this record about how many feet of water will move down the new channel and why reservoir basins will be needed to take care of the overflow, and just how the backwater of the Mississippi River will cover some lands. One of the most essential points in the whole plan is the floodway. That floodway damages were within legislative contemplation is shown by Section 2 of Act 249 of 1949: "* * * and provided further damages shall be paid for any easement or flowage right, or increased use or servitude, on any lands by reason of increasing the amount or depth of water on same, regardless of whether said lands are protected or unprotected by levees, and these damages shall be in addition to damages set out in said Act 177 of 1945". See also *Garland Levee Dist.* v.

*Hutt,* 207 Ark. 784, 183 S. W. 2d 296; and *Watson* v. *Harris,* 214 Ark. 349, 216 S. W. 2d 784.

In *Drainage Dist.* v. *Haverstick,* 186 Ark. 374, 53 S. W. 2d 589, we held that a drainage district which dammed two rivers and diverted their waters from their natural flow into an artificial floodway, thereby precipitating water upon the plaintiff's land in increased volume, was liable for the damages caused thereby. In *Little Rock & Ft. Smith Ry. Co.* v. *Greer,* 77 Ark. 387, 96 S. W. 129, Chief Justice McCulloch said on rehearing: "The principle is made clear in the original opinion that where a railroad corporation lawfully acquires a right of way over land either by grant, prescription or condemnation, such acquisition covers all damages, present and prospective, resulting to the owner whose land is invaded. This is upon the theory that full compensation is allowed at the time and can be recovered only once." In *Baucum* v. *Ark. P. & L. Co.,* 179 Ark. 154, 15 S. W. 2d 399, in discussing damages in an eminent domain case, we said: "The court should also have charged the jury that full compensation for the market value and damages should be assessed in this suit, as future damages could be recovered only for the negligent use of the right-of-way condemned." In 18 Am. Jur. p. 887 (Eminent Domain § 249), in discussing prospective damage from use ultimately[3] contemplated by the condemnor, the general rules are stated as follows:

"All loss occurring by the taking is to be assessed in one proceeding. The damages to be recovered must cover all future uses of the condemned property that are or should be within the contemplation of the parties at the time of the taking, irrespectively of the extent of the present needs  *  *  *  The land having been taken and appropriated, the right of the landowner to sue for his damages is complete, and he may recover the entire damages that may be

[3] There is an annotation in 75 ALR 855, entitled: "Right to compensation in eminent domain on basis of entire extent of property or complete use ultimately contemplated in excess of present requirements."

caused by the location and by the subsequent construction.''

We, therefore, hold that the Trial Court was correct in awarding floodway damages to the landowners, Morledge, Thomas, Edgar, and Dillon.

III. *The Amount of the Chancery Awards to the Landowners, Morledge, Thomas, Edgar, and Dillon.* In its Points 10 to 13, inclusive, the appellant claims that the damages were excessive that were awarded by the Chancery Court to these four landowners; and by cross appeals each of the landowners claims that the Trial Court failed to award sufficient damages. In Point I we held that the landowners were entitled to all elements of damages shown to result from the taking; and in Point II, we held that floodway damages come within such purview. These two holdings support the Chancery Court in its basic determination of the elements of damages. A review of the voluminous testimony on the damages to each landowner would serve no useful purpose. The Chancery decree is affirmed on both direct appeal and cross appeal insofar as concerns the landowners, Morledge, Thomas, Edgar, and Dillon.

IV. *The Gatling Cases.* The Gatling lands are in both Cross and St. Francis Counties but both of the eminent domain cases are involved on this appeal. The Gatling cases were tried on a theory of damages entirely different from the theory on which were tried the cases of Morledge, Thomas, Edgar, and Dillon; and thus the Gatling cases necessitate this separate topic. Gatling did not seek floodway damages in these cases, and reserved until a later date right to claim floodway damages.[4] The Court decree in the Gatling case contains

---

[4] The Gatling brief in this Court contains this language: (Gatling) ". . . sought only damages for the lands actually taken and other damages occasioned by the construction of the ditch; and the decree reserved to the appellee Gatling the right to recover for damages to his adjoining lands at any time within five years after the damage occurs, as provided in Act 249 of the Acts of 1949". The reason that Gatling desired to reserve his claim for flood damages was—as stated by his attorney in the oral argument before this Court — because the Gatling

this language, which was stated to us in the oral argument to have been the result of a stipulation between the parties: "That no consideration has been taken of any possible damage which may accrue to the defendants in the future because of any claim for damages to other lands of the defendants for any easement or flowage right or increased use or servitude of said lands by reason of increasing the amount or depth of water on same, whether the lands are protected or unprotected by levees".

Of the Gatling lands, the District condemned for the right of way of the new channel 60.02 acres of cultivated lands (which the appraisers valued at a total of $17,-665.50), and 66.57 acres of woodlands (which the appraisers valued at a total of $2,496.38). The total allowed by the appraisers was $20,161.88. The Chancery Court allowed Gatling $300.00 an acre for his cultivated land, and $50.00 an acre for his woodlands, or a total of $21,339.00 for the lands actually taken; and as to this figure the appellant raises no objection. But the Chancery Court also allowed Gatling the following items of damages, which the appellant challenges: $5,000.00 for the taking of Sand Slough; $5,000.00 for damages because of the inconvenience of crossing the new river and the isolation of certain lands because of the new river; and $750.00 damages to buildings on the right of way. It is only as to these three items, totalling $10,750.00, that the appellant raises any claim in the Gatling appeal; and a careful study of the record convinces us that the appellant's contentions are without merit, in view of our holdings in Points I and II in the cases involving the other landowners herein. Sand Slough was a body of water useful for irrigation, recreation, and other purposes, and the channel of the new river is to take this waterway; and the landowner is entitled to recover damages for all property taken or damaged. Part of the Gatling lands will be on one side of the river and part on the other, and one tract will be prac-

---

lands are on high ground and have never been flooded, even in 1927, and Gatling doubted his ability to prove floodway damages unless the top of the east levee is higher than the Gatling lands.

tically isolated because of road conditions. Furthermore, some of the Gatlings' houses on or touching the right of way have not been moved. We, therefore, conclude that the Chancery decree should be affirmed in the Gatling cases.