UNITED STATES $v.$ SPONENBARGER ET AL.

No. 72. Argued November 7, 8, 1939.—Decided December 4, 1939.

*Mr. Warner W. Gardner,* with whom *Solicitor General Jackson, Assistant Attorney General Shea,* and *Messrs. Paul A. Sweeney, Charles A. Horsky,* and *Aaron B. Holman* were on the brief, for the United States.

258

*Mr. Lamar Williamson,* with whom *Mr. Joseph W. House* was on the brief, for respondent Sponenbarger.

*Mr. Samuel A. Mitchell.* was on a brief for Mercantile-Commerce Bank & Trust Co. et al., respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondent sued the United States under the Tucker Act,[1] alleging that the Mississippi Flood Control Act of 1928 [2] and construction contemplated by that Act involved an "intentional, additional, occasional flooding, damaging and destroying" of her land located in Desha County, Arkansas. She maintained that her property had thus been taken for a public use for which the Government is required to pay just compensation by the Fifth Amendment.[3] In addition, she asserted a statutory right of recovery under the Act itself. After full hearing, judgment for the Government was entered in the District Court.[4] The Circuit Court of Appeals reversed.[5] Because of the importance of both the legislation and the principles involved, we granted certiorari.[6]

A summary of the history behind the Mississippi Flood Control Act of 1928 clarifies the issues here. Respondent's land is in the alluvial valley of the Mississippi River. Alluvial soil, rich in fertility, results from deposits of mud and accumulations produced by floods or flowing water. Thus, floods have generously contributed to the fertility of the valley. However, the floods that have given fertility have with relentless certainty undermined the security of life and property. And occupation of the alluvial valley of the Mississippi has always been subject to this constant hazard.

---

[1] 28 U. S. C. 41 (20).

[2] c. 569, 45 Stat. 534; 33 U. S. C. 702 (a).

[3] Cf. *Jacobs* v. *United States*, 290 U. S. 13, 16.

[4] 21 F. Supp. 28.

[5] 101 F. 2d 506.

[6] 307 U. S. 621. Respondent primarily claims that governmental operations under the Flood Control Act have resulted in taking for public use her lands lying in the proposed Boeuf Floodway. This Floodway was originally intended to cover a vast area roughly fifteen miles wide and one hundred and twenty-five miles long.

To enjoy the promise of its fertile soil in safety has, for generations, been the ambition of the valley's occupants. As early as 1717, small levees were erected in the vicinity of New Orleans. Until 1883, piecemeal flood protection for separate areas was attempted through uncoördinated efforts of individuals, communities, counties, districts and States. Experience demonstrated that these disconnected levees were utterly incapable of safeguarding an ever increasing people drawn to the fertile valley. Under what was called the Eads plan, the United States about 1883 undertook to coöperate with, and to coördinate the efforts of the people and authorities of the various river localities in order to effect a continuous line of levees along both banks of the Mississippi for roughly nine hundred and fifty miles—from Cape Girardeau, Missouri, to the Gulf of Mexico.[7] Recurrent floods, even after the eventual completion of this tremendous undertaking, led to the conclusion that levees alone, though continuous, would not protect the valley from floods. And in 1927 there occurred the most disastrous of all recorded floods. In congressional discussion of the 1928 Act, it was said—as the evidence here discloses—that "There were stretches of country [in Arkansas] miles in width and miles in length in which . . . every house, every barn, every outbuilding of every nature, even the fences, were swept away. It was as desolate as this earth was when the flood subsided."[8] Respondent's land, under fifteen to twenty feet of water, was left bare of buildings of any kind in this 1927 flood.

The 1928 Act here involved accepted the conception—underlying the plan of General Jadwin of the Army Engineers—that levees alone would not protect the valley from floods. Upon the assumption that there might be

---

[7] For the background of this legislation, see *Jackson* v. *United States*, 230 U. S. 1.

[8] 69 Cong. Rec., Part 8, p. 8191.

floods of such proportions as to overtop the river's banks and levees despite all the Government could do, this plan was designed to limit to predetermined points such escapes of floodwaters from the main channel. The height of the levees at these predetermined points was not to be raised to the general height of the levees along the river. These lower points for possible flood spillways were designated "fuse plug levees." Flood waters diverted over these lower "fuse plug levees" were intended to relieve the main river channel and thereby prevent general flooding over the higher levees along the banks. Additional "guide levees" were to be constructed to confine the diverted flood waters within limited floodway channels leading from the fuse plugs. The suggested fuse plug which respondent claims would damage her property was to be at Cypress Creek, within two to two and one-half miles of her land, and her land lies in the path of the proposed floodway to stem from this particular fuse plug.

The 1928 Act provided for a comprehensive ten-year program for the entire valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds. However, before any part of this program was actually to be carried out, the Act required extensive surveys "to ascertain . . . the best method of securing flood relief in addition to levees, before any flood control works other than levees and revetments are undertaken." Lands intended for floodways were, pending completion of the floodways, to enjoy the protection already afforded by levees.

The District Court found—

Respondent's land lies in that part of the Boeuf Basin which the plan of the 1928 Act contemplated as a diversion channel or floodway. This Basin has always been

a natural floodway for waters from the Mississippi,[9] and respondent's lands, and other lands similarly situated, have been repeatedly overflowed by deep water despite the presence of strong levees.[10] The United States has not caused any excessive flood waters to be diverted from the Mississippi through the proposed Boeuf fuse plug (at Cypress Creek) or floodway, and respondent's property has not been subjected to any servitude from excessive floodwaters, which did not already exist before 1928. She still enjoys the same benefits from the Cypress Creek drainage system as when it was created before 1928, and the government program has not "in any wise, nor to any extent increased the flood hazard thereto." No work was ever commenced or done within the area of the proposed Boeuf floodway, and the fuse plug heading into it was never established. This floodway as a whole has been abandoned and the Eudora floodway substituted. However, work done under the 1928 Act has shortened the river by cut-offs and dredging and the river has been lowered five or six feet, with the greatest improvement in the vicinity of the proposed fuse plug. Levee protection to lands such as plaintiff's has not been reduced. In fact, plaintiff's land has been afforded additional protection by virtue of the fact that this government improvement program has materially reduced the crest of the river at all times, including flood crests, and her land has also been protected by the Government's reconstruction of levees on the Arkansas River pursuant to its general program. In 1935, her property would have been flooded but for the work done by the Government which has kept her land free of overflow since 1928. Lands,

---

[9] This Basin also was found to be a floodway for waters from the Arkansas and "Flat" (White) Rivers.

[10] Her lands were found to have been flooded in 1912, 1913, 1919, 1921, 1922, 1927.

such as respondent's, located immediately behind levees along the main stem of the Mississippi, are liable to be inundated and destroyed by the breaking of river front levees and from natural crevassing, regardless of the height and strength of the levee. Loss in market value of respondent's property, since 1927, has not been caused by any action of the Government, but is due to the flood of 1927, the depression and other causes unconnected with the governmental program under the 1928 Act. The United States has in no way molested respondent's possession or interfered with her right of ownership. She has remained in uninterrupted possession of her property operating it as a farm and borrowing money upon it as security.

From these findings the District Court concluded as a matter of law that—

(1) Respondent's property had not been taken within the meaning of the constitutional prohibition against taking without compensation;

(2) Under the facts of this case, respondent had no statutory right of recovery under the 1928 Act itself.

In reversing the District Court's judgment, the Circuit Court of Appeals decided that the Boeuf floodway had not been abandoned by the Government, but was in operative existence notwithstanding that the proposed guide levees along the floodway had not been built and levees on the Mississippi both immediately above and below the proposed fuse plug had not been raised above the height of what would have been the fuse plug levee. The Circuit Court of Appeals said that "By the provisions of this plan of flood control . . . [respondent's land] is subjected to a planned and practically certain overflow in case of the major floods contemplated and described. No one can foretell when such may occur, but that is the only remaining uncertainty. . . . If, and when, such floods do occur, serious destruction must be conceded."

Upon these conclusions, the Circuit Court held that there was a taking of respondent's property.

*First.* This record amply supports the District Court's finding that the program of improvement under the 1928 Act had not increased the immemorial danger of unpredictable major floods· to which respondent's land had always been subject. Therefore, to hold the Government responsible for such floods would be to say that the Fifth Amendment requires the Government to pay a landowner for damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the Government undertaken no work of any kind. So to hold would far exceed even the "extremest" [11] conception of a "taking" by flooding within the meaning of that Amendment. For the Government would thereby be required to compensate a private property owner for flood damages which it in no way caused.

An undertaking by the Government to reduce the menace from flood damages which were inevitable but for the Government's work does not constitute the Government a taker of all lands not fully and wholly protected. When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect. In the very nature of things the degree of flood protection to be afforded must vary. And it is obviously more difficult to protect lands located where natural overflows or spillways have produced natural floodways.

The· extent of swamps and overflowed lands in the Boeuf floodway and the history of recurrent floods that have passed through it, support the District Court's finding that the proposed Boeuf floodway is a naturally created floodway. And the Government's problem was by

---

[11] Cf. *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642; *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.

channel stabilization, dredging, cut-offs or any effective means, to prevent diversions from the Mississippi at all points if possible. But if all diversions could not be prevented, the Government sought to limit the flooding to the least possible number of natural spillways heading into natural floodways. If major floods may sometime in the future overrun the river's banks despite—not because of—the Government's best efforts, the Government has not taken respondent's property. And this is true, although other property may be the beneficiary of the project. The Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted; and the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all.

The far reaching benefits which respondent's land enjoys from the Government's entire program precludes a holding that her property has been taken because of the bare possibility that some future major flood might cause more water to run over her land at a greater velocity than the 1927 flood which submerged it to a depth of fifteen or twenty feet and swept it clear of buildings. Enforcement of a broad flood control program does not involve a taking merely because it will result in an increase in the volume or velocity of otherwise inevitably destructive floods, where the program measured in its entirety greatly reduces the general flood hazards, and actually is highly beneficial to a particular tract of land.

The constitutional prohibition against uncompensated taking of private property for public use is grounded upon a conception of the injustice in favoring the public as against an individual property owner. But if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would

be to grant him a special bounty. Such activities in substance take nothing from the landowner. While this Court has found a taking when the Government directly subjected land to permanent intermittent floods to an owner's damage,[12] it has never held that the Government takes an owner's land by a flood program that does little injury in comparison with far greater benefits conferred.[13] And here, the District Court justifiably found that the program of the 1928 Act has greatly reduced the flood menace to respondent's land by improving her protection from floods. Under these circumstances, respondent's land has not been taken within the meaning of the Fifth Amendment.

*Second.* Even though the Government has not interfered with respondent's possession and as yet has caused no flooding of her land,[14] respondent claims her property was taken when the 1928 Act went into effect and work began on its ten-year program because the Act itself involves an imposition of a servitude for the purpose of intentional future flooding of the proposed Boeuf floodway. But, assuming for purposes of argument that it might be shown that such supposed future flooding would inflict damages greater than all benefits received by respondent, still this contention amounts to no more than the claim that respondent's land was taken when the statutory plan gave rise to an apprehension of future flooding. This apprehended flooding might never occur for many reasons—one of which is that the Boeuf floodway might never be begun or completed. As previously pointed out, the Act directed comprehensive surveys be-

---

[12] *Jacobs v. United States, supra; United States v. Cress,* 243 U. S. 316; *United States v. Lynah,* 188 U. S. 445; *Pumpelly v. Green Bay Co., supra;* cf. *Sanguinetti v. United States,* 264 U. S. 146.

[13] Cf. *Bauman v. Ross,* 167 U. S. 548, 574.

[14] Cf. *Marion & R. Valley Ry. Co. v. United States,* 270 U. S. 280, 282, 283.

fore utilization of any means of flood control other than levees and revetments. In general language it adopted a program recommended by the Chief of Army Engineers, but Congress did not sweep into the statute every suggestion contained in that recommendation.

Since it envisaged a vast program, the Act naturally left much to the discretion of its administrators and future decisions of Congress.[15] Recognizing the value of experience in flood control, Congress and the sponsors of the Act did not intend it to foreclose the possibility of changing the program's details as trial and error might demand.

Here, it is clear that those charged with execution of the program of the 1928 Act abandoned the proposed Boeuf floodway and substituted another. Whatever the original general purpose of Congress as to that floodway and its fuse plug at Cypress Creek, congressional hearings, reports and legislation have approved their abandonment. Thus, respondent's contention at most is that the Government should pay for land which might have been in a floodway if that floodway had not been abandoned. We think this contention without merit.[16]

*Third.* Respondent's "right of self defense" against floods through locally built levees has not been taken away. The 1928 Act does not represent a self-executing assumption of complete control over all levees to the exclusion of the States and local authorities. Respondent's argument that it does rests upon § 9 of the Act making § 14 of the Act of March 3, 1899 (33 U. S. C.

---

[15] Cf. *South Carolina* v. *Georgia*, 93 U. S. 4, 13. As to when legislation does not constitute self-executing appropriation, see *Bauman* v. *Ross*, 167 U. S. 548, 596–7; *Willink* v. *United States*, 240 U. S. 572.

[16] Whether recovery at law could be had upon a similar contention was left open by *Hurley* v. *Kincaid*, 285 U. S. 95. Cf. *Peabody* v. *United States*, 231 U. S. 530, 539, 540.

408), which forbids interference with levees, "applicable to all lands, waters, easements and other property and rights acquired or constructed under the provisions of this [1928] Act." But § 14 of the 1899 Act relates only to levees and other structures "built by the United States," and no local levees on which respondent could rely have as yet been "built by the United States" or "acquired . . . under the provisions of" the 1928 Act. In fact, a proposal that the Government assume control of local levees appeared in the original draft of the 1928 Act but was stricken out by amendment.[17] And the War Department, charged with its administration, has treated the Act as leaving local interests free to raise proposed fuse plug levees if they wish.[18]

*Fourth.* It is argued that the 1928 Act itself requires judgment for respondent even though her property was not "taken" within the Fifth Amendment. The pertinent provisions are—

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however,* That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river, it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so

---

[17] 69 Cong. Rec., Part 7, pp. 7114, 7115.

[18] Com. Doc. No. 2, House Committee on Flood Control, 71st Cong.,

270

subjected to overflow and damage or floodage rights over such lands.

". . . The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: . . ."

This Court has previously decided that "the construction of levees on the opposite" bank of the Mississippi River which resulted in permanently flooding property across the river did not amount to a "taking" of the flooded area within the Fifth Amendment.[19] We need not here determine whether the provisions of the 1928 Act would themselves grant a statutory right to recover if respondent's land had been damaged as a result of levees constructed on the river's opposite bank. For § 4 of the Act contains the further specific reservation "That in all cases where the execution of the flood-control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid." On this record it is clear that respondent's lands were not damaged, but actually benefited.

We do not find it necessary to discuss other questions presented.

The judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed.

*Reversed.*

---

[19] *Jackson* v. *United States, supra,* 22, 23.