Raymond L. STOVER et al., Guy L. Williams et al., J. Eldred Audit et al., Anna Sperry et al., Tamotsu Tsutsui et al., Gabriel Alvarez et al., Floyd Ardell Adams et al., John A. Bergman et al., B. J. Ukropina et al., James Bozidar Ukropina, etc., Joan Darlene Ukropina, etc., Harlan M. Van Dyke et al., Howard F. Van Dyke et al., Vandy Farms, a California corp., Chris Bessler, William Nicholas, B. Neil Johnson, etc., Plaintiffs,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

STATE OF CALIFORNIA, Third-Party Defendant and Third-Party Plaintiff,

v.

LEVEE DISTRICT NO. 1 OF SUTTER COUNTY, Third-Party Defendant in Civil Nos. 7483, 7486, 7506, 7545, 7635, 7664 and 7665,

and

Reclamation District No. 784, Third-Party Defendant in Civil No. 7664 only,

and

Reclamation District No. 1001, Third-Party Defendant in Civil Nos. 7665, 7667, 7668, 7669, 7670, 7672, 7673, 7675, 7676 and 7677.

Civ. Nos. 7483, 7486, 7506, 7545, 7635, 7664–7670, 7672, 7673, 7675–7677.

United States District Court
N. D. California, N. D.
April 23, 1962.

478

Perkins & Carr, Sacramento, Cal., and Emmett J. Seawell, Ivan J. Sperbeck, Oakland, Cal., for Raymond L. Stover and others.

Benjamin H. Brown, Sacramento, Cal., Goldstein, Barceloux & Goldstein, Chico, Cal., and Malone, Dennis & Schottky, Sacramento, Cal., for B. J. Ukropina and others.

Benjamin H. Brown, Sacramento, Cal., and Goldstein, Barceloux & Goldstein, Chico, Cal., for John A. Bergman and others.

Benjamin H. Brown and Malone, Dennis & Schottky, Sacramento, Cal., for Howard F. Van Dyke and others.

Goldstein, Barceloux & Goldstein, Chico, Cal., for Gabriel Alvarez and others.

Simeon S. Reibin, Sacramento, Cal., for B. Neil Johnson.

William B. Spohn, Asst. U. S. Atty., San Francisco, Cal., for the United States.

Stanley Mosk, Atty. Gen., Robert Burton, Deputy Atty. Gen., Sacramento, Cal., for State of Cal.

Hewitt & McBride, Yuba City, Cal., for Levee Dist. No. 1 of Sutter County.

Steel & Arostegui, Marysville, Cal., for Reclamation District No. 784.

Hewitt & McBride, Yuba City, Cal., for Reclamation Dist. No. 1001.

HALBERT, District Judge.

In these actions for damages (amounting to some $13,000,000) resulting from the inundations of December, 1955, in the Marysville-Yuba City area, the United States has asserted several affirmative defenses (See: Huffmaster v. United States, D.C., 186 F.Supp. 120).[1] Jurisdiction is asserted under the Federal Tort Claims Act (Title 28 U.S.C. §§ 1346 and 2671 et seq.). The asserted causes of action are for negligence in the planning, design, construction, maintenance and operation of the levees and other works comprising the Sacramento River Flood Control Project, of which the Feather River and its tributaries are part.

Pursuant to a pre-trial order entered in this action on November 21, 1961, trial has been held on the limited issue raised by the affirmative defense of the United States involving the provisions of Title 33 U.S.C.A. § 702c.[2] I am now called upon to resolve this issue in the light of the facts adduced at the trial and the law applicable to those facts.

## I. The Facts

The Feather River basin is located on the western slope of the Sierra Nevada mountain range, northeasterly from the Sacramento Valley in California. The basin includes the drainage areas of the Feather River and its tributaries, principally the Yuba and Bear Rivers, and covers approximately 5,900 square miles, ranging in elevation from about 30 feet to about 10,000 feet. Approximately

---

1. The United States, in this action, has impleaded the State of California, and the State in turn has impleaded Levee District No. 1 of Sutter County, Reclamation District No. 784, and Reclamation District No. 1001. The issues raised by the answers of the impleaded parties are not here involved.

2. That section provides, in pertinent part, that: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: * * *."

116,000 acres of land were inundated by the three major rivers of the basin during the period of December 23–24, 1955. Of these 116,000 acres, approximately 85,000 were inundated by waters flowing through breaks in three levees.

One of these breaks, referred to as the Gum Tree break, took place in the right levee of the Feather River just downstream from Yuba City (and from the confluence of the Feather and Yuba Rivers), and was a specific factor in the inundation of the town itself. A second break occurred in the left levee of the Feather River just downstream from the town of Nicolaus (and from the confluence of the Feather and Bear Rivers), and is known as the Nicolaus break. A third area of inundation, caused by a series of breaks, occurred to the west of the right levee of the Western Pacific Interceptor Canal, near the town of Rio Oso (and north of the Bear River). These breaks are referred to, collectively, as the Western Pacific Interceptor Canal breaks.

During the early part of December, 1955, two storms swept over the entire Feather River basin (As used hereinafter, the Feather River basin refers to the drainage areas of the Feather, Yuba and Bear Rivers.). By the 10th of December, many rain-gauging stations in all three drainage areas had received 70% of the normal precipitation for the entire month.[3] This early rainfall prepared the ground for the later disastrous events, by soaking the soil to a near saturation point.

On December 16, the first major storm of a series arrived in the basin. It was a warm-type storm and extended over the entire area, climaxing in heavy rain on the 18th and 19th. Snow fell during this storm only at elevations above 6,000 feet. Since the soil had been primed earlier, rivers and streams of the area rose sharply. A second major storm followed immediately on the heels of the first, reaching all elevations of the basin on the 21st and 22nd. Because this storm reached all elevations, there was some snow melt resulting from the warm rainfall. This second storm was followed immediately by a third (the warmest of the series) on the 22nd and 23rd of the month. This third storm also brought warm rainfall to high elevations, resulting in considerable snow melt.

A comparison of the precipitation received in December, 1955, with that recorded over the previous 50 years at specified locations within the Feather River basin indicates the abnormal extent of rainfall which preceded the inundations.[4] During the period of *one week* preceding the levee breaks, the Feather River basin received nearly 200% of the *monthly* normal precipitation (This in a month that

3. By the 10th of December, the following average amounts of precipitation had been recorded by the gauging stations in the individual drainage areas:

| Drainage Area | Number of Stations | Recorded Rainfall | Monthy Normal |
|---|---|---|---|
| Feather River | 8 | 4.97 | 7.95 |
| Yuba River | 8 | 7.32 | 9.57 |
| Bear River | 5 | 5.79 | 7.37 |

4. It is important to note that the Nicolaus break occurred on December 23 shortly after noon, and that the Gum Tree break followed at approximately 12:10 a.m. on December 24. The record does not indicate the precise time at which the Western Pacific Interceptor Canal breaks occurred. With these dates in mind, the following precipitation figures indicate the extent of rainfall occurring which could have been involved in, and connected with, the breaks.

| Drainage Area | Rainfall during specified times of the month | | | Monthly Normal |
|---|---|---|---|---|
| | 1st–22nd | 15th–22nd | 23rd | |
| Feather River | 19.57 | 14.60 | 2.77 | 7.95 |
| Yuba River | 24.91 | 17.59 | 4.66 | 9.57 |
| Bear River | 18.24 | 12.45 | 3.40 | 7.37 |

is regularly rainy).[5] This deluge arrived at a time when the ground was still saturated from the storms of earlier in the month, which meant that the amount of water run-off would be greatly increased as the capacity of the ground for water absorption decreased.

Turning away from a comparison with prior averages and norms, and looking to previous specific weather conditions which had caused floods, the month of December, 1955, appears as a singularly extraordinary period of weather phenomena. The records of the 16 rain-gauging stations with records extending back at least to 1915 were received in evidence, with a tabulation of the "maximum annual five consecutive day precipitation amounts" indicated. Of these 16 stations, the five consecutive day maximum precipitation amounts in December, 1955 (the particular period involved was, in most cases, December 19 through December 23 [6]), were the highest of record at 10 stations, the second highest at 4 stations, the third highest at 1 station, and the fourth highest at 1 station. At the stations where December, 1955, was not the highest of record, there was no other single year in which the maximum for those stations coincided during the same storm period.[7]

In addition to the extraordinary precipitation which took place during the month of December, 1955, and connected therewith, was the magnitude of the streamflow emerging from the mountains and foothills onto the valley floor. The readings of three of the stream-gauging stations which recorded the flow are particularly significant, since they are located at the foothill line of the streams that flow into the lower basin, rather than up in the watershed, and are relatively unaffected by the upstream works of man.[8]

During the month of December, 1955, the stream flow of the Feather River, at the gauging station near Oroville, increased from a rate of approximately 5,-000 c. f. s. (cubic feet per second) at the beginning of the month, through successively higher peaks which culminated in a peak flow of 203,000 c. f. s. on December 23. Similar increases in stream flow occurred on the Yuba River (peaking at 148,000 c. f. s. on December 23) and the Bear River (peaking at 33,000 c. f. s. on December 22). These flows were the maximum, or near the maximum, of record. The Feather River near Oroville had the second highest peak during the 59 years of record.[9] On the Yuba River, the flood peak was some 40% higher than had occurred during the 57 years of record prior to December, 1955. On the Bear River, the flood peak was the highest in 56 years of record.

Correlative with the recordings of streamflow are the records of the river stage levels during this period. Similar findings attend a reading of such records. In each case, the stage level at the gauging stations of the Feather, Yuba and Bear Rivers, and their tributaries, were

5. Considering the fact that the Feather River basin is a heavy rainfall belt, it is noteworthy that the amount of precipitation received in that area during the two-week period of December 15–28 ranged from 40% to 65% of normal *for the entire year*.

6. From December 19 through December 23, the average precipitation measured in inches at the gauging stations throughout the basin amounted to 15.41 for the Feather River drainage area, 20.31 for the Yuba River drainage area, and 14.39 for the Bear River drainage area. One station registered, in a five-day period, 27.49 inches of precipitation, more than 8 inches over the preceding high.

7. Most of the preceding maximums occurred at times which have generally been accepted as the times of previous "floods." The most common periods of previous highs were November, 1950; February, 1940; and December, 1929.

8. The selected gauging stations are located on the Feather River near Oroville, on the Yuba River at Englebright Dam, and on the Bear River near Wheatland.

9. On March 19, 1907, during the floods of that year, the discharge rate at the Oroville gauging station was 230,000 c.f.s.

either at or near the highest which had been recorded.[10]

Although the most definitive studies were made at the three above-mentioned gauging stations, similar results were noted at all of the gauging stations in the lower Feather River basin.

The general situation was described by the following summary, given by Professor Ray K. Linsley, Executive Head of the Department of Civil Engineering at Stanford University:

"I think this was primarily a flood caused by heavy rains of the moderate-intensity-long-duration type as compared to flash floods caused by very intensive thunderstorms. The rains resulted in run-off, an increase of stream flow from a low flow on the Feather River at the beginning of the month of under 5,000 cubic feet per second to a peak of slightly over 200,000 cubic feet per second, which hydrologists would certainly consider a flood event. The channels were filled with water above their natural banks; water was on the levees, and again * * * this we would consider a flood."

## II. The Law

My labors in the legal field are, by the very nature of this proceeding, confined to the limited issue generated by the defendant's affirmative defense based on the provisions of § 702c of Title 33 U.S.C.A.[11] No consideration is here given to any other affirmative defenses.[12]

Plaintiffs contend, essentially, that § 702c is simply a legislative recognition of the principle that the Government is not liable for damage proximately caused solely by the elements.[13] They argue that

---

10. The following river stage readings were taken during the events here involved, and compare with previous recordings at the same stations. These readings are indicative, but not exhaustive, of the readings at all the stations throughout the basin.

| River and Gauging Station | December, 1955 Reading | Previous Maximum |
|---|---|---|
| Feather River near Oroville | 76.77 | 73.6 (Dec., 1937) |
| Feather River at Nicolaus | 51.60 | 47.80 (Nov., 1950) |
| Yuba River at Englebright Dam | 17.73 | 14.69 (Nov., 1950) |
| Yuba River at Marysville | 82.5 | 71.27 (Nov., 1950) |
| Bear River near Wheatland | 19.30 | 20.83 (Nov., 1950) |

---

11. As already noted, § 702c of Title 33 U.S.C.A., in pertinent part, provides that "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: * * *."

The United States contends that this section provides for a blanket immunity from liability of any kind, arguing that the statutory language is broad and unequivocal, and refers to both floods and flood waters (presumably intending a differentiation between damages caused by the initial impact of a flood and damages caused by the settling of flood waters and the debris carried thereby).

12. Specifically excluded from consideration at this trial was the Government's affirmative defense under Title 28 U.S.C. § 2680(a), involving "discretionary functions."

13. Plaintiffs seek to distinguish between the effects of foreseeable meteorological phenomena (referring to such conditions as "acts of the elements"), and the effects of clearly unforeseeable climatic conditions (referring to such conditions as "acts of God"). Viewed in the light of my interpretation of the law applicable to this case, such a semantic exercise appears to me to involve a distinction without a difference. The foreseeability of the conditions (as opposed to the foreseeability of the results of those conditions) has no relevance to the issues here involved. In view of the facts as I have found them to be, it is inconceivable that any reasonable person would not expect a flood to occur as a result of the climatic conditions hereinbefore described.

§ 702c does not prevent liability on the part of the United States where its negligence is *either* the sole proximate cause of the damage, or in combination with the elements is the proximate cause of the damage. As supplementary contentions, and subsidiary to the basic argument of construction, the plaintiffs argue that § 702c is geographically limited in its application to the area of the Mississippi River and its tributaries, and that if § 702c is construed as contended by the United States, it is unconstitutional.

A pre-trial ruling, made on October 19, 1961, was incorporated into the pre-trial order filed on November 21, 1961. This order was intended to serve as a guide for the trial of the § 702c affirmative defense. Subject to change during the proceedings, I there set down the ground rules under which such trial was to be conducted.[14] In conjunction with this ruling, certain offers of proof of plaintiffs, involving the issue of negligence, and referred to in their memoranda, were rejected as immaterial, or irrelevant, or both, to the issue of the special defense under § 702c.

At the trial, and in response to evidence received through testimony of meteorological experts, I revised Paragraph III of my pre-trial ruling by replacing the word "precipitation" with the words "climatic conditions." This was done in response to the evidence concerning saturation of the soil, the amount and location of snow, the speed with which the snow melted, and wind conditions. I also noted several possibilities for a redefinition of the requirements for a "flood," with particular emphasis on the fact that a flood involves water where it *ordinarily* would *not* be *expected* to be.

Plaintiffs have attempted, throughout these proceedings, to introduce evidence dealing with the negligence, or alleged negligence, of the United States in setting up, and administering, the Sacramento River Flood Control Project (which includes the Feather River and its tributaries). This evidence has been rejected at all times during the trial of the § 702c affirmative defense.

It is true, as plaintiffs point out, that causation is a basic issue in this action. But plaintiffs go too far in characterizing the causation required as "proximate." The statute reads only in terms of "damage from or by floods or flood waters," rather than a more explicit "damage proximately resulting from floods or flood waters." A concept of "damage from" involves a consideration of actual, rather than proximate, causation. Thus, a determination of the causation issue must begin with the question of whether or not the inundations of which plaintiffs complain resulted, in whole *or in part*, from unusual or extraordinary climatic conditions. On the issue presently before me,

14. It is there stated: "I am convinced that I am bound by the ruling of the United States Court of Appeals in Clark v. United States [9 Cir.], 218 F.2d 446, and I am further convinced that the Court meant what it said in its opinion in that case. Accordingly, I rule:

"I. That the immunity granted to the United States by Title 33, United States Code, § 702c is available to the United States in all factually appropriate cases;

"II. That the immunity granted to the United States by Title 33, United States Code, § 702c is not limited to the Mississippi River area, but in fact extends over the entire United States.

"III. That § 702c of Title 33, United States Code Annotated, applies to all floods 1 and flood waters which result in whole or in part from unusual or extraordinary 2 precipitation;

"IV. That § 702c of Title 33, United States Code Annotated, does not apply to 'man-made floods' 3 which result *solely* from negligent acts.

"1. Flood, as used here, means such a quantity of escaping or flowing water as will cause damage or injury to persons or property, who but for its escape or flow would be safe from it.

"2. Unusual or extraordinary, as used here, means conditions which, in the light of experience, would not be anticipated by a normal person using ordinary care.

"3. The term 'man-made flood' means a flood (as defined above) which is created *solely* by the construction or fabrication of a barrier which impounds a substantial quantity of water which, but for the barrier, would not have been impounded."

it is of no consequence how negligent the Government may (or may not) have been, if it be shown that the inundations, even in part, resulted from, and were *actually* caused by, such natural forces.

■ Plaintiffs' contention that § 702c is geographically restricted to the Mississippi River and its tributaries has been previously considered by the Court of Appeals for the Ninth Circuit in Clark v. United States, 218 F.2d 446, at 451–452, and has been rejected. Such rejection, in addition to recommending itself as a reasonable and logical construction of the statute, is, of course, binding upon this Court.

Plaintiffs submit the case of Guy F. Atkinson Co. v. Merritt, Chapman, & Scott Corp., D. C., 126 F.Supp. 406, as support for their contention that the instant disaster is a "man-made flood," and as such falls within the fourth category of the pre-trial order. Examination of that case discloses that it is factually distinguishable from the instant situation. In that case, the construction involved was the erection of Folsom Dam, an edifice designed to halt the natural flow of water so that it might be used for purposes of power, irrigation, and flood control. In essence, Folsom Dam was to be the specific cause of water backing up in a great amount. In the instant case, however, the levees which burst were built alongside the rivers involved, and above and beyond the natural river banks. They were intended not to halt the flow of water, but rather to control and direct it.

Plaintiffs attempt to distinguish Clark v. United States, supra, by pointing out that the negligence charged in that case

was not of a type which had a causal relationship to the damages suffered, and that to that extent, the Atkinson case has overruled the Clark case. To the contrary, there was an allegation in the Clark case that the Government, after having seized a dike which had been improperly constructed, negligently failed to repair that dike, which subsequently collapsed. The fact that there were also allegations of negligence involving flood forecasts, evacuation notices and other actions causally unrelated to the natural event should not be allowed to obscure the basic similarity between the Clark case and the present one.

In resolving this issue, it must be kept in mind that waters which overflow the natural banks of a river, but which remain contained by a levee system, which prevents them from spreading out over the countryside and causing untold amounts of damage, are as much "flood waters" as those which escape and actually do damage.[15] The basic element of a "flood" is the fact that waters are out of their natural channel. Whether or not a flood or flood waters cause damage is a question entirely separate and apart from the question of whether in fact a flood exists.

■ Coming to the contention of the United States that § 702c exempts the Government from claims of damage in *every* instance following floods or flood waters, I am in accord with plaintiffs' proposition that such a construction would raise questions of constitutional interpretation, involving the deprivation (or potential deprivation) of property without due process of law. Under the Government's construction, the entire law

15. Expert testimony has been received (and common sense supports the same conclusion) to the effect that "if a flood occurs when water escapes from the stream channel, then when man provides levees to contain the water in the channel * * * we should also consider it a flood if water is actually kept in the channel by the levees. * * * [I]f the water in the channel does rise out to the levees * * * it is a flood." The expression "rising out to the levees" means a situation where the water level in the stream rises so that it is being held from spreading out because of the levees. In other words, the water has risen to a point where it would normally inundate the surrounding countryside, but in the particular situation is restrained from doing so by the levees. This, of course, presupposes that the levees are built so as to overlook the land in its natural state.

of inverse condemnation, for example, would be inapplicable to situations involving water. I do not interpret § 702c as granting a blanket immunity to the Government in all cases involving the destruction of, or damage to, property by every conceivable type of flood or flood water (See: Atkinson v. Merritt, Chapman & Scott, supra). In situations where the negligence of the Government is the *sole* proximate and actual cause of the "taking" of the property, § 702c is not a defense upon which the Government can rely. Section 702c applies only to situations where natural forces alone, or in conjunction with artificial causes, such as negligence, operate to bring about the final result.[16]

■ Section 702c does, however, have meaning. Furthermore, it has not been repealed, by implication, by the Federal Tort Claims Act (Clark v. United States, supra; National Manufacturing Co. v. United States, 8 Cir., 210 F.2d 263; and Villarreal v. United States, D.C., 177 F.Supp. 879). Each of these statutes has a mutually exclusive scope.[17] In the case of § 702c, a Congressional intent to avoid liability for damages actually resulting from natural floods or flood waters is patent.

■ In ascribing meaning to § 702c, I have seen nothing during the course of the trial to cause me to retreat from the preliminary determination I made in the pre-trial order of November 21, 1961. It appears that § 702c was, and is, intended to save the United States harmless from liability in cases involving natural floods, or flood waters, whether or not there is a concurrence of negligence with

such flood waters. It is not, however, intended to extend to inundations of an artificial nature, solely caused by the instrumentalities of man.

■ Natural floods and flood waters are those which result from unusual or extraordinary climatic conditions. The words "unusual" and "extraordinary" refer to the climatic conditions and not the results of the climatic conditions. It was not, and is not, my intention to suggest or imply that the resultant effects of such climatic conditions must be such as could not, or would not, have been anticipated by a reasonably prudent man using ordinary care. To the contrary, I intend these words to indicate climatic conditions from which a reasonably prudent man, using ordinary care, *would* expect a flood to result. Specifically, natural floods and flood waters result from climatic conditions which are so unusual or extraordinary as to leave a reasonably prudent man, using ordinary care, with an abiding conviction that a flood will occur as the result of such conditions.

There well may be some statements in the record of this case which appear to be, or in fact actually are, inconsistent with the position which I now take. If such there be, they are not to be taken as being a final expression of my views. My final views are expressed in this memorandum.

### III. Conclusions

In view of the factual and legal situation involved in this action, as set forth above, I now determine the ultimate facts to be:

1. During the month of December, 1955, unusual and extraordinary climatic

16. It has been noted elsewhere that the constitutional prohibition against the taking of private property for public use without just compensation was kept in view by the passage of § 702c (National Manufacturing Co. v. United States, 8 Cir., 210 F.2d 263, citing United States v. Sponenbarger, 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230).

17. "The Federal Tort Claims Act of August 2, 1946, had not been passed in 1928 or 1936 and the government then

had a certain sovereign immunity from suit for torts but when Section 3 [§ 702c] is read in its context it is clear Congress meant by it that damages from or by floods or flood waters should not afford any basis of liability against the United States regardless of whether the sovereign immunity was availed of or not. The declaration of Section 3 negates the existence of a cause of action against the United States in the situation covered by it." National Manufacturing Co. v. United States, 210 F.2d at 271.

conditions existed in the Feather River basin, including the drainage areas of the Feather, Yuba and Bear Rivers.

2. Prior to December 23, 1955, certain waters had overflowed the natural banks of the Feather, Yuba and Bear Rivers, and were being contained by a system of levees, which constituted part of the Sacramento River Flood Control Project.

3. On December 23–24, 1955, certain breaks in said levee system occurred. These breaks were located in the right levee of the Feather River just downstream from Yuba City (the Gum Tree break), in the left levee of the Feather River just downstream from the town of Nicolaus (the Nicolaus break), and in the western levee of the Western Pacific Interceptor Canal (the Western Pacific Interceptor Canal breaks).

4. As a result of such breaks, waters flowed over certain lands in the Feather River basin, causing damage thereto.

The ultimate applicable conclusions of law in this case, on this limited issue, I find to be:

1. The immunity granted to the United States by Title 33 U.S.C.A. § 702c is not limited to the Mississippi River area, but in fact extends over the entire United States.

2. A "flood" is water which inundates an area of the surface of the earth where it ordinarily would not be expected to be.

3. Water which has overflowed the natural banks of the stream in its natural channel, and which is contained by a system of levees, is "flood water."

4. Title 33 U.S.C.A. § 702c applies to all floods and flood waters which result *in whole or in part* from unusual or extraordinary climatic conditions, that is, from climatic conditions which are so severe that a reasonably prudent man using ordinary care would expect a flood to occur as a result of such conditions.

5. The term "man-made flood" means a flood (as previously defined) which is created *solely* by the construction or fabrication of a barrier which impounds a substantial quantity of water which, but for the barrier, would not have been impounded.

6. Title 33 U.S.C.A. § 702c does not apply to "man-made floods" which result *solely* from negligent acts.

7. The waters which inundated certain of plaintiffs' lands as a result of the breaks in the levee system at Gum Tree, Nicolaus, and Western Pacific Interceptor Canal, were part of a flood, within the meaning of the terms "floods or flood waters" as used in Title 33 U.S.C.A. § 702c. Section 702c of Title 33 U.S.C.A. therefore provides the defendant, United States of America, with a complete legal defense to these actions.

IT IS, THEREFORE, ORDERED that judgment in these actions, and each of them, be, and the same is, hereby entered in favor of the defendant, United States of America;

AND IT IS FURTHER ORDERED that said defendant prepare findings of fact and conclusions of law, a form of judgment, and any other required documents, and lodge them with the Clerk of this Court pursuant to the applicable statutes and the rules of this Court.