JOHN B. HARDWICKE COMPANY and
Charles E. Pratt
v.
The UNITED STATES.
No. 97–68.

United States Court of Claims.
Oct. 13, 1972.

George D. Byfield, Austin, Tex., for plaintiffs; Morgan Hunter, Austin, Tex., attorney of record; C. Morris Davis, and McGinnis, Lochridge & Kilgore, Austin, Tex., of counsel.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, and KUNZIG, Judges.

## OPINION

NICHOLS, Judge:*

The plaintiffs, John B. Hardwicke Company and Charles E. Pratt, are seeking just compensation under the Fifth Amendment for an alleged taking of a flowage easement by the defendant over approximately 573 acres of a 829.52 acre tract located in the lower Rio Grande Valley of Texas. The alleged taking took place on August 30, 1967. On that date the International Boundary and Water Commission, prompted by the threatened flooding of the Brownsville-Matamoros area, in course of a flood on the Rio Grande, closed the gates of the Anzalduas Dam and diverted the waters of the Rio Grande into Mission Inlet, inundating plaintiffs' property.

The plaintiffs' property is located in the natural flood plain of the Rio

---

* We acknowledge the assistance afforded us by the able opinion and findings of fact of former Commissioner, now Judge, Marion T. Bennett. We have prepared our own opinion because we reach the same result by a different route.

Grande River. In the natural state of affairs this land was subject to flooding on an average of once every two years. The first attempts at flood control in the area took place in the 1920's when Cameron and Hidalgo Counties initiated a system of flood control works. By 1930, however, it had become evident that the problem of flooding could only be dealt with adequately by gaining the cooperation of Mexico. In 1932 an accord was reached between the United States and Mexico which provided for flood control works along the lower Rio Grande Valley. In that same year the International Boundary Commission prepared a report entitled "Preliminary Report on Flood Control Plans—Lower Rio Grande". The plan contemplated among other things the construction of two diversion dams. The first was to be located immediately below Mission Inlet and the second at a point opposite Donna, Texas, and Colombres, Tamaulipas (downstream from Hardwicke property). This plan called for diversion of the Rio Grande into Mission Inlet and thence to the floodway at times of flooding. (IBWC Minute 196, pp. 1–3 of Engineers Report.) See authorizing legislation 22 U.S.C. § 277a and ff.

Though portions of the 1932 plan could be acted upon forthwith, other parts, including the construction of the diversion dams, were delayed until an agreement as to the division of the run-off water could be reached between the United States and Mexico. The Treaty of February 3, 1944, constituted that agreement. The treaty established the International Boundary and Water Commission (IBWC), and provided: 1.) for the construction of "The dams and other joint works required for the diversion of the flow of the Rio Grande * * *", and the construction of three international storage dams, the furthest downstream being the Falcon Dam (above plaintiffs' property) Article 5, Sect. II of the Treaty, 59 Stat. (Part 2) 1219; and, 2.) "The Commission shall study, investigate, and prepare plans for flood control works, where and when necessary, other than those referred to in Article 5 of this Treaty, on the Rio Grande (Rio Bravo) from Fort Quitman, Texas to the Gulf of Mexico." Article 6.

Because of the operation of other segments of the Rio Grande water control program, in 1950 the IBWC modified its 1932 proposal for the construction of two diversion dams. Instead the Commission proposed the "construction of [one] diversion dam to divert water into that [United States] floodway, as was contemplated in the original [1932] plan." Minute 196 IBWC pp. 3–4. This dam was to be the Anzalduas Dam. Congress first appropriated funds for the construction of Anzalduas Dam in 1952 as part of the "expenses necessary to enable the United States to meet its obligations under the treaties of 1884, 1889, 1905, 1906, 1933, and 1944 between the United States and Mexico, and to comply with the other laws applicable to the United States Section, International Boundary and Water Commission * * *". 67 Stat. 369–370. It is significant that of the Treaties and laws mentioned in the construction section of the appropriation only the 1944 Treaty, which specified as one of its projects the construction of Falcon Dam, authorized the construction of diversion dams on the lower Rio Grande. As written, the construction section of the 1952 appropriation points to the fact that Congress understood the Anzalduas Dam to be expressly provided for in the 1944 Treaty.

As called for in the 1944 Treaty, Falcon Dam was placed in operation in 1952. The operation of this dam reduced the anticipated incidence of flooding on the land at issue from once every two years to once every ten years. This reduction for the first time made the land in question suitable for farming.

In 1959 Anzalduas Dam was completed and it was placed in operation in 1960. It is estimated that the operation of this dam increased the incidence of flooding on the land in question to once every seven or eight years. Thus, though the incidence and severity of flooding was increased from what it would have been

if only Falcon Dam was in operation the expectation of flooding was still far less than it would have been if there had been no flood control program at all.

In 1961, John B. Hardwicke, Jr., William A. Hardwicke and Charles E. Pratt began acquiring portions of the property in question and by 1963 all 892.52 acres of what is now the Hardwicke property was acquired and developed into farm land. Of the 892.52 acres of land constituting the Hardwicke property 320.76 acres were encumbered with various easements obtained by the defendant so as to insure the continued use of Mission Inlet for flood control purposes.

As noted above, on August 30, 1967, the IBWC, prompted by the threat of flooding in the Brownsville-Matamoros area, and the damages to life and property inherent in the flooding of a highly populated area, closed the gates of Anzalduas Dam. This action caused the backing up of river waters, their diversion into Mission Inlet, and the flooding of plaintiffs' property. The question raised is whether the defendant should have to pay compensation because of an alleged taking which took place as a result of the construction and operation of Anzalduas Dam.

In 1943, Justice Roberts writing for the majority of the Supreme Court in the case of United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, established what has come to be known as the Miller Doctrine. According to this doctrine a condemnor need not compensate a landowner for value which the condemnor creates by the establishment of the project for which the landowner's land is condemned. Miller affirmed the ruling of the trial judge excluding from an award for property taken, enhancement of its value resulting from the project itself. The same principle is for application when, in a flooding case, the question is whether property is taken at all.

In United States v. Sponenbarger, 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939), the respondent was the owner of land designated as a floodway as part of a flood control program for the Mississippi River. Although respondent's land was on the whole benefited by the flood control program, respondent claimed a Fifth Amendment taking on the ground that the program contemplated the construction of higher levees surrounding the floodway so as to have floodwaters run off onto respondent's property. In his opinion denying relief to respondent, Mr. Justice Black stated, pp. 266–267, 60 S.Ct. p. 229:

> * * * if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty. * * *

In United States v. Reynolds, 397 U.S. 14, 18, 90 S.Ct. 803, 806, 25 L.Ed.2d 12 (1970) the Court reaffirmed Miller and held that for it to apply, the correct test was whether the property was "probably within the scope of the project from the time the Government was committed to it, * * * *".

Before 1950 a buyer of land in the neighborhood of Mission Inlet knew or should have known that the flood control plan agreed upon with Mexico contemplated the construction of both storage and diversion dams. Since 1932 Mission Inlet had been viewed as a strategic means of diverting floodwater from the riverbed into the United States floodway. He could not have counted on the floodway remaining unused. The 1950 decision of the IBWC was more than the ordinary recommendation of Government officials because of the Treaty obligation it implemented. The substitution of the Anzalduas Dam at that date did not alter the potential burden on plaintiffs' property since defendant continued to rely on Mission Inlet for diversion, as the 1932 plan had done. The Congressional appropriation of 1952, supra, recognizes that Anzalduas will be built in fulfillment of an international obligation under a Treaty.

1952 also saw the completion of Falcon Dam and thus there never was a

time when an owner of land near Mission Inlet could have directly benefited from Falcon, yet have been unaware that Anzalduas would arise in fulfillment of the same scheme. There was no time when plaintiffs or their predecessors in title could have reasonably supposed that land near Mission Inlet could benefit from the impoundment of water at Falcon, yet be free of the disadvantages that might arise from the diversion dam, when built and in use. The trial commissioner did not accept the contentions of the plaintiffs as to their actual beliefs, but in any event the legal standard is not subjective belief, but probability.

The plaintiffs say they paid in 1961–63 prices enhanced by the presence of Falcon Dam and its anticipated success in controlling floods. On those dates Anzalduas Dam was completed and in plain sight, with its gates. Vendors to plaintiffs may have benefited from Falcon without taking a detriment because of Anzalduas, but in the circumstances, we do not think the defendant can be penalized because of this business decision between private parties. We think the circumstances show sufficient nexus between Falcon and Anzalduas, sufficient probability that Anzalduas would come into being after Falcon, so that plaintiffs cannot base a taking claim on the hypothesis that they can garner the benefit conferred by Falcon, without deduction for the probable detriment when Anzalduas comes into being too.

Prior to the construction and operation of Falcon Dam the Hardwicke property was not suited to farming because of often recurring floods. The approximate value of the property prior to the operation of Falcon Dam was $170,000. After Falcon Dam was placed in operation, and the danger of flooding greatly reduced, the property became suitable for farming and rose in value to $392,500, if valued without Anzalduas. After the construction of Anzalduas the likelihood of flooding of the Hardwicke property increased somewhat and the value of the Hardwicke property with Anzalduas Dam in operation was $352,250. It is clear that, while the operation of Anzalduas Dam has diminished the value of plaintiffs' property, on the whole, the value of the Hardwicke property has been greatly enhanced by the operation of the Rio Grande water control program, of which both Falcon and Anzalduas Dams are parts.

In view of the *Sponenbarger* decision, and because this case falls under the purview of the *Miller* Doctrine, petitioners' claim for relief is denied and the conclusion of the commissioner is affirmed. The petition is dismissed.